13  133
109  358

## WELLS, FARGO & CO. *v.* ROBINSON, Administrator of FRIERSON.

If a Confidential Agent, trusted by a principal with money used in trade, appropriates the money to the purchase of property for his own use and benefit, and the property can be identified as that so bought, the Agent will be held as Trustee for the owner of the money.

A suit at law to recover judgment against an Administrator for money embezzled by his intestate, pending which, a bill in equity was filed to recover the property bought with the money, and prosecuted to a decree after judgment was taken at law for the amount, evidences no such distinct and deliberate choice to take the general claim on the estate for money, in lieu of the claim on this property, as to bar plaintiff from prosecuting his equitable claim.

The doctrine of election is applicable only when the party is cognizant of all the facts, and then makes a free and deliberate choice.

Under our system, a judgment against an Administrator is little, if any, better than an allowance by him, and approval by the Probate Judge.

An Administrator being compelled by law to hold, protect, and guard, funds coming into his hands, which he has reason to believe to be assets of the estate, until the right to the funds can be determined, is entitled to his commissions thereon.

APPEAL from the Sixth District.

For facts see opinion.

*Clark & Gass,* and *Winans,* for Appellants.

I. Where a plaintiff, on the ground of an implied trust between him and defendant, is entitled to certain bonds, bought by defendant with plaintiff's funds, but proceeds to take a verdict and common law judgment against defendant for the amount of said bonds, the act of going to trial and taking a money judgment at common law, constitutes an election on the part of said plaintiff.

In that case, the remedies at law and in equity being inconsistent, such plaintiff is bound by his election, and cannot, subsequently to the taking of said judgment, enforce in equity his claim to the bonds *in specie.* (2 Story's Eq. Jur. Sec. 1262; *Sawyer* v. *Wood,* 3 Johns. Ch. 416; *Mocher* v. *Reed,* 1 Ball & Beatty, 318; *Bond* v. *Hopkins,* 1 Schoales & Le Froy, 441; *Combs* v. *Perleton,* 2 B. Munroe, 194. See, also, *Ex Parte Ward,* 1 Atk. 153; *Ex Parte Lewes,* 1 Id. 154; *Ex Parte Warder,* 3 Brown, 191; *Ex Parte Cator,* 3 Id. 216; *Seligman* v. *Kalkman,* 8 Cal. 216; *Merrick* v. *Darling,* 11 Ohio, 343; *Rogers* v. *Vosburgh,* 4 Johns. Ch. 84; *Thompson* v. *Graham,* 1 Paige, 452.)

II. The relation existing between plaintiffs and Angus Frierson did not render him their Trustee, *quoad* the fund in controversy embezzled by him. Nor could the change of that fund from money into gas stock, even if directly traceable, constitute the conversion of a trust fund.

The theory upon which plaintiffs rely is, that wherever the property of a party has been wrongfully misapplied, or converted into another species of property, if its identity can be traced, it will be held in its new form liable to the rights of the original owner. But this doctrine only has application where the relation of Trustee and *cestui que trust* exists. (Willard's Eq. Juris. 599; Hill on Trustees, 144.)

III. It is denied that the money embezzled by Fierson from plaintiffs was converted into the bonds in controversy, nor can its identity be distinctly and separately traced into any new form of property.

It is a fundamental doctrine of the Court of Chancery that, in order to get equity you must do equity. And yet plaintiffs, although they ask equitable relief, in having these bonds construed to have been obtained with their own money, actually show that they were obtained with the money of others, but fall back upon the legal and inequitable technicality that that money became theirs because put into their trays, although it was immediately drawn out again. Certainly, if these bonds are to be security for any moneys, it must be for those of the owners of the thirty thousand dollars deposited with Frierson, not for plaintiffs. (*Hertell* v. *Bogert*, 9 Paige, 52; *Dilly* v. *Bernard*, 8 Gill & J. 170; Story's Eq. Juris. Secs. 1258, 1259, 1265.)

IV. Janes being the agent of plaintiffs, and also a Director of the Gas Company, in the latter capacity sanctioned the transfer of the stock in controversy to defendant, instead of acting in the former capacity and preventing the same by setting up plaintiffs' rights in the Glenn and Chittenden stock held by defendant. This conduct and the sanction by plaintiffs' agent of the sale of these bonds to defendant was an acquiescence on plaintiffs' part in defendant's right to hold the bonds, and estopped them from setting up an adverse claim to them.

*Latham & Sunderland*, for Respondents.

Did plaintiffs elect to take a judgment at law, and abandon their suit in equity?

Before either suit was brought plaintiffs notified defendant of their intention to hold the bonds. Both suits were instituted about the same time, and by them defendant was again notified what plaintiff claimed.

The judgment in the first suit has been called a common law judgment. We submit where there is nothing more than a quasi judgment, no execution can issue. The money cannot be collected by process issued thereon. The effect of the verdict of the Jury was simply to establish the amount of the defalcation by Frierson. (Woods' Digest, p. 405, sec. 140.)

The case at bar is unlike any of the cases cited by Appellant, the general doctrine of which we do not deny. Whenever the plaintiff has been held to have elected another remedy, it was because no excuse or reason was assigned for prosecuting the two suits. In this case it was a necessity, the Administrator having rejected our demand. (*Coleman* v. *Cross*, 4 B. Munroe, 270).

The same Court (in 9 Dana, 425,) say: "The principle is, that the defendant shall not be unnecessarily vexed or harrassed with two suits at the same time for the same cause of action. The bare fact of two suits at the same time is not of itself sufficient always to abate the prior suit, if both may be necessary to attain the ends of justice."

In answer to his second point, we refer the Court to Story on Agency, (Secs. 229—231, and authorities there cited; 4 Kent's Com. 305, 306).

BALDWIN, J. delivered the opinion of the Court—FIELD, J. concurring.

This was a bill in equity, to recover certain bonds and choses in action in the hands of defendant. It appears that in 1854, and for several years afterwards, the plaintiffs were bankers and dealers in exchange, in Sacramento; and that Frierson was their cashier and bookkeeper for a portion of this time, and until his death, in February, 1855; and while so employed, he embezzled and converted to his own use moneys belonging to the plaintiffs to the large amount of one hundred and ninety-five thousand eight hundred and eighty-nine dollars.

After the death of Frierson, Robinson became his Administrator, and plaintiffs in due time after the publication of the statutory notice, presented to defendant their claim for this sum, with an affidavit appended, averring that the estate was indebted to the plaintiffs in this amount; and, also, that fifty thousand dollars of this sum was advanced by Frierson to the Sacramento Gas Company, and that for this amount the plaintiffs claimed a lien upon all the gas stock of the estate, and all bonds of the Gas Company held by defendant as Administrator. The Administrator rejected the whole claim. In May, 1856, plaintiffs commenced a common law action against defendant for the

whole amount of the claim, as a money demand.   Pending this suit, viz: on the 1st July, 1856, plaintiffs filed this bill; on the 19th January, 1857, the plaintiffs proceeded to try this common law action, and recovered judgment for the whole sum.   Afterwards, the plaintiffs prosecuted to a decree in their favor this bill.   No part of the judgment has been paid.

On the 18th November, 1854, one Wm. Glen was the owner and holder of two thousand one hundred shares of the capital stock of the Sacramento Gas Company, of the nominal value of two hundred and ten thousand dollars, upon which an assessment of three dollars per share had been paid by Glen.   On that day, Glen and Frierson entered into a contract by which the latter was to advance and pay all assessments that might be made on the stock by the company, for eight months next after the making of the contract; and upon all assessments thus paid, Glen was to pay Frierson interest at the rate of two and a half per cent. per month, payable monthly; and in the event that it was not promptly paid, to be compounded.   To secure Frierson in these advances, Glen delivered him this stock as collateral security. On the 28th December, 1854, one Chittenden was the owner of five hundred and twenty shares of the capital stock of the company, of the nominal value of fifty-two thousand dollars, upon which he had paid an assessment of three per cent. on the nominal value of the stock; and, on the same day, he and Frierson entered into a contract of like import to the one with Glen, and this last stock was deposited with Frierson as collateral security for such advantages as he might make.   At the date of these contracts, and to the time of his death, Frierson was President of the Sacramento Gas Company.   A settlement was made between the Gas Company and the Administrator of Frierson, on the 1st of September, 1855; by which it appeared that Frierson, after the making of the contracts with Glen and Chittenden, advanced to them, in the way of assessments on this stock, the sum of forty thousand two hundred dollars; and by an agreement, and in the way of a settlement of the accounts of Frierson and the company, the Administrator assigned to the company, Frierson's demand against Glen and Chittenden for advances, and in consideration thereof, the company issued to the Administrator the bonds mentioned in the complaint.   At the time of this set-

tlement, one Janes was the Managing Agent of Wells, Fargo & Co. in this State, and was, also, one of the Directors of the Gas Company, and was present and assisted in the settlement.    Be- tween the 1st July, 1854, and Frierson's death, there were deposited with Frierson, by various persons, large sums of money, amounting in all, to thirty thousand dollars, to be invested by him for their use and benefit.    Frierson kept a large cash account with Wells, Fargo & Co. and this thirty thousand dollars was deposited with plaintiffs, to Frierson's credit, and so entered on their books.

The Court finds that it was "admitted that during all the time these deposits were being made with Frierson, and by Frierson, with the plaintiffs, there was a balance against him on the books of plaintiffs."    "The exhibits introduced show daily balances against him, on plaintiffs' books, between the 8th of November, 1854, and the 18th of February, 1855, of from a few hundred dollars to upwards of thirty thousand dollars.    It is shown that for several months, immediately preceding his death, he was in the habit of falsifying the books and making forced balances of the cash accounts.    The testimony of the clerks about the house of Wells, Fargo & Co. shows that the money deposited with Frierson by third persons, for investment, was mingled with plaintiffs' money and put into their trays."    The Judge proceeds with his finding, thus: "Their witnesses, also, state that payments were made by Frierson, on account of the Gas Company and for Glen and Chittenden, out of the moneys taken from plaintiffs' trays, in the banking house.    But they were not able to state the amount of these payments.    The answer admits that all of the money deposited, as above stated, with Frierson was used by him in paying the assessments on Glen and Chittenden's stock. There is no evidence to show that Frierson, during the time these assessments were being paid by him, which was between the 2d of November, 1854, and the 23d of February, 1855, had any money of his own with which to pay the same, except the proceeds of his wages, unless the deposits, above mentioned, are to be considered his property.    It is also shown, that he was engaged in other transactions requiring the use of large amounts of money, and which were sufficient to consume the whole of his wages.    From all the evidence in the case, I am satisfied, and so

find the facts to be, that all of the assessments paid on the stock of Glen and Chittenden were paid from the funds of the plaintiffs, and from the money deposited with Frierson under the circumstances above stated, and after it had been mingled with the funds of the plaintiffs, and that the plaintiffs were ignorant of the fact of its use, and the manner of using it, until after Frierson's death. But the plaintiffs had all the information as to the amount of money used, and the purposes for which it was used, at the time of the commencement of the suit at law against the Administrator, that they possessed at the institution of this suit."

Three questions arise on this statement.

1. Can Wells, Fargo & Co. follow this money, appropriated or invested by their agent, and claim the property or securities into which the money went, as theirs, or subject to their claim, assuming that the proofs sustain the claim in point of fact?

2. If so, have they waived or forfeited their right by the common law suit and judgment; if not—

3. Do the proofs show that *their* money was so appropriated?

In respect to the first question, it does not distinctly appear by the record what were the powers and duties of this cashier or book-keeper, Frierson, except so far as may be inferred from the designation given him, nor the exact nature and character of the business of plaintiffs, whether it embraced loans on stocks or other securities, or the purchase of such. But it does sufficiently appear that Frierson had the custody and charge of their money, and that very great confidence was reposed in him. The operations into which he carried the money of his employers were entered into on his private account. The money invested by him was embezzled. The question then is, whether, if a confidential agent trusted by a principal with money used in trade, appropriates the money to the purchase of property for his own use and benefit, and the property can be identified as that so bought, the agent can be held as Trustee for the owner of the money. This proposition is, in effect, held by the Judge below, and is denied by the counsel for the Appellant.

Frierson, in this matter, may be considered in equity as a Trustee of this money, which he was to hold and dispose of for the proper uses and purposes of the firm of Wells, Fargo & Co.

He, of course, had no right to divert the money to other uses. It matters little whether he was intrusted to employ the money in the purchase of gold dust or exchange for his principals, or only to pay it out on the order of those who did, or keep it in his possession, until needed by the firm. In either case, he took the money of Wells, Fargo & Co. intrusted to him in a fiduciary capacity, and loaned it on certain securities, in his own name, and for his own account. The rule is thus stated by Mr. Justice Story: (Eq. Juris. vol. 2, Secs. 1258—1261.) "Upon similar principles, wherever the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held, in its new form, liable to the rights of the original owner, or *cestui que trust.* The general proposition, which is maintained both at law and in equity upon this subject is, that if property, in its original state and form, is covered with a trust in favor of the principal, no change of that state and form can divest it of such trust, or give the Agent or Trustee converting it, or those who represent him in right, (not being *bona fide* purchasers for a valuable consideration without notice,) any more valid claim in respect to it, than they respectively had before such a change. An abuse of a trust can confer no rights on the party abusing it, or on those who claim in privity with him. This principle is fully recognized at law in all cases where it is susceptible of being brought out as a ground of action, or of defense, in a suit at law. In Courts of Equity it is adopted, with a universality of application.

Thus, for instance, if A is intrusted by B, with money to purchase a horse for him, and A purchases a carriage with that money, in violation of the trust, B is entitled to the carriage, and may, if he chooses so to do, sue for it at law. So, if A intrusts money with a broker to buy Bank of England stock for him, and he invests the money in American stocks, A is entitled to, and may maintain an action at law for those stocks, in whosesoever hands he finds them, not being a purchaser for a valuable consideration without notice. It matters not in the slightest degree into whatever other form, different from the original, the change may have been made, whether it be that of promissory notes, or of goods, or of stock; for the product of a substitute for

Wells, Fargo & Co. *v.* Robinson.

the original thing still follows the nature of the thing itself, so long as it can be ascertained to be such. The right ceases only, when the means of ascertainment fail; which, of course, is the case, when the subject matter is turned into money, and mixed and confounded in a general mass of property of the same description.

Cases may readily be put, where this doctrine would be enforced in equity under circumstances in which it could not be applied at law. Thus, for instance, if a Trustee, in violation of his duty, should lay out the trust money in land, and take a conveyance in his own name, the *cestui que trust* would be without any relief at law. But a Court of Equity would hold the *cestui que trust* to be the equitable owner of the land, and would decree it to him accordingly; not upon any notion of his having ratified the act, but upon the mere ground of a wrongful conversion, creating, in *foro-conscientiæ*, a trust in his favor."

Thus, it is also held in several cases, that if property has been rightfully sold by an Agent or Trustee, if the proceeds of the sale can be distinctly traced, the property belongs in equity, and often in law, to the principal. Thus, for example, if a factor sells goods consigned to him for sale, and takes notes for the purchase money, those notes, if he fails, will belong to his principal, and not to his assignees or representatives. (1 Atk. 233; 3 Mason, 322; 4 Simon, 438.)

We cannot see that the fact that this money was embezzled makes the rule any the less applicable.

2. It is contended that the plaintiffs have elected to consider the estate of Frierson as their debtor for the amount of this money, including the money advanced to Chittenden and Glen, on this stock; and, therefore, that they cannot recover the stock or the debt due from Chittenden, or the bonds growing out of the transaction. This point rests on the fact, that suit was brought for the money in the common law action, and judgment taken for the full amount. It has been seen that the claim presented to the Administrator was for the bonds as a part of the subject of the embezzlement; and that shortly afterward this bill was filed, setting up this special claim.

This doctrine of election has been a vexed subject of jurisprudence. Judge Story, vol. 2, (Jur.) Sec. 1097, says: " Questions

have also arisen in Courts of Equity, as to what acts or circumstances should be deemed an election on the part of the person bound to make it. We say acts or circumstances; for positive acts of acceptance or of renunciation are not indispensable. Presumptions equally strong may arise from long acquiescence, or from other circumstances of a stringent nature. Upon such a subject no general rule can be laid down; but every case must be left to be decided upon its own particular circumstances, rather than upon any definite abstract doctrine. Before any presumption of an election can arise, it is necessary to show that the party acting, or acquiescing, was cognizant of his rights. When this is ascertained affirmatively, it may be further necessary to consider whether the party intended an election; whether the party was competent to make an election; for a *feme covert*, an infant, or a lunatic, will not be bound by an election; whether he can restore the other persons affected by his claim to the same situation as if the acts had not been performed, or the acquiescence had not existed; and, whether there has been such a lapse of time, as ought to preclude the Court from entering upon such inquiries, upon its general doctrine of not entertaining suits upon stale demands, or after long delays.

Questions have also arisen in Courts of Equity, as to the time when, and the circumstances under which, an election may be required to be made. The general rule is, that the party is not bound to make an election, until all the circumstances are known, and the state, and condition, and value of the funds, are clearly ascertained; for, until so known and ascertained, it is impossible for the party to make a discriminating and deliberate choice, such as ought to bind him to reason and justice. If, therefore, he should make a choice in ignorance of the real state of the funds, or under misconception of the extent of the claims on the fund, elected by him, it will not be conclusive on him. And, on the other hand, he will be entitled, in order to make an election, to maintain a bill in equity for a discovery, and to have all the necessary accounts taken to ascertain the real state of the funds." (See also Kent, C. J. Opinion in *Dash* v. *Van Kleek*, 7 John. 497.)

We think the suit brought at law by the plaintiffs under the circumstances, and the judgment taken—the bill in equity still

pending—and the distinct claim set up to this fund and afterwards prosecuted to judgment, evidence of no such distinct and deliberate choice to take the general claim on the estate for money in lieu of the claim on this fund, as to bar the plaintiffs from prosecuting their equitable claim. It would be unreasonable to suppose that they intended to surrender a claim on a specific fund they were then prosecuting for a judgment against the Administrator, which would give them no better right to participate in this fund than the rest of the creditors: that is, that they meant that property bought with their money should be equally distributed among all those creditors. The case would be stronger for the Appellants if a judgment here had the same effect as at common law. But under our system, a judgment is but little if any better than an allowance by the Administrator and approval of the Probate Judge. It fixes a recognized claim on the estate: that is, it furnishes a voucher which protects the Administrator in its payment. But it gives no priority, and carries with it no means of security, or coercive payment by execution. No injury has been done by the judgment. For any credit to which the estate may be entitled under this bill, and the decree, the Administrator may require a rebatement from the judgment. Nor is it at all certain that the plaintiffs could know, or did know, until the termination of this suit, whether their money had gone to the investment in question; indeed, it is earnestly insisted, even now, that such was not the fact. In such case, the doctrine of Chancellor—then C. J. Kent, in *Dash* v. *Van Kleek*, is directly applicable. In that case, it was attempted to be set up that a party, suing a Sheriff for an escape, was estopped, because, when the prisoner was retaken, he opposed his discharge, and, therefore, elected to hold him in custody. But it was answered, " that the mere fact of opposing the debtor's discharge without having, at the time, any knowledge of the previous escape, cannot conclude the plaintiff. He undoubtedly might, with knowledge of the escape, have waived his remedy against the defendant, and have elected to consider his debtor in custody under the succeeding Sheriff; but without such knowledge, the law will not infer any determination of the party prejudicial to his rights. It would be equally absurd and unjust to conclude that the plaintiff had waived his

remedy for the escape, when he was ignorant of the fact." "Election," says Dyer, (Dyer, 281,) "is the internal, free, and spontaneous separation of one thing from another, existing in the mind and will." In that case, the failure to show this knowledge was held fatal to the point that the election was made.

The third and last point is, that the plaintiffs have not shown that their money went into this investment. We do not feel inclined to disturb the finding of the Court below on this question of fact. It may be true that other persons deposited money with Frierson. But if Frierson acted as cashier of Wells, Fargo & Co. in receiving it, we do not see how his Administrator can complain of this being considered the money of the house with which it was deposited. If this money was deposited with Frierson in his individual capacity, and on his individual responsibility, then it is shown he passed it over to his principals as his own, giving them credit on the books for it. We do not see how, under this last view, Wells, Fargo & Co. could be held by the Administrator of Frierson to account for this money, or how he could set up that, possibly, it was this money which was invested by Frierson in these loans. There certainly was much evidence tending to show that the money of plaintiffs was used by Frierson in this investment; and we are not disposed to disturb the finding to that effect of the Judge who heard all the proofs.

As these bonds were taken in lieu of the indebtedness and stock pledged as collateral security, they stood—as the plaintiffs are willing to affirm the arrangement—as the stock; and the plaintiffs are entitled to receive the bonds for the purpose of their security, as if they had been delivered to them by Glen and Chittenden.

We do not think it necessary to notice other points, as these views are conclusive of the case on the merits.

Decree affirmed.

On a petition for rehearing, the following opinion was delivered by BALDWIN, J.—TERRY, C. J. concurring.

We deny the petition for a rehearing. Robinson, the Administrator, having taken the credits which came to his hands as Administrator, and which he had reason to believe to be assets of the estate, and with the assent of the agent of Wells, Fargo &

Co. turned them into these bonds, is entitled to his commissions allowed by law in such cases—just as if these credits had been in the form of promissory notes payable to Frierson, and the Administrator had collected the money and deposited it.   The law forced him to hold, protect, and guard, the fund until the right to it was determined, and it is just and legal for him to charge for his services what the law allows him to charge for collecting and disbursing other assets.   The judgment of this Court will be modified accordingly.