[Civ. No. 376.   Fifth Dist.   Mar. 10, 1965.]

OSCAR ORLOPP et al., Plaintiffs and Respondents, v. WILLARDSON COMPANY, INC., Defendant and Appellant.

Oren, McCartney & Sells and Donald E. Oren for Defendant and Appellant.

Charles F. Hamlin and Kimble, MacMichael & Runner for Plaintiffs and Respondents.

BROWN (R. M.), J.—This is an appeal by appellant Willardson Company, Inc., from an adverse judgment entered in a nonjury case and from ''any and all other judgments entered herein against it, whether written or entered in the clerk's minutes.'' Appellant also notices its appeal from an order denying its motion made pursuant to section 663 of the Code of Civil Procedure to vacate the judgment and enter a different judgment, which is appealable. However, in briefs, appellant specifically limits its appeal to the judgment and we may deem its appeal from the order abandoned.

Additional defendants who are not parties to this appeal were William Seiler and Francis Batz, copartners doing business as Seiler & Batz, and Mid-Valley Poultry and Egg Company, which is in bankruptcy.

The trial court entered judgment for $29,679.54, its basis being the unpaid balance due on an open book account as of March 30, 1961, for eggs delivered to Seiler & Batz. Liability of the appellant is predicated upon the fact that prior to

March 30, 1961, the appellant was an undisclosed joint venturer with Seiler & Batz in a program of breeding and raising fryer turkeys. The principal contention on appeal is that the trial court erred as a matter of law in failing to credit appellant's payments made on the open book account after March 30, 1961, the date appellant withdrew from the joint venture and another firm, Mid-Valley, took its place as an undisclosed joint venturer.

Respondents were in the business of producing and selling turkey eggs for hatching. Seiler & Batz had been previously engaged in a small turkey raising program, and approached respondents concerning the possibility of purchasing turkey eggs for a more extensive program. Seiler told respondent Paul Orlopp that he had a "financial angel," but did not want to disclose his identity.

In accordance with a planned program, respondents delivered eggs to Seiler & Batz and a bookkeeping account was set up in the name of Seiler & Batz. Not having adequate financing to sustain the program, in 1960 Seiler & Batz secretly entered into a written joint venture agreement with the appellant, who was to supply the necessary financing. Subsequently, all but three of the stockholders of appellant withdrew from the turkey raising program and a new corporation known as Mid-Valley Poultry and Egg Company was organized. On March 30, 1961, by written agreement, appellant withdrew as a joint venturer and assigned all its interest in and to the venture to Mid-Valley, which assumed all obligations of the joint venture.

During all of this time the respondents did not know that appellant or Mid-Valley were joint venturers with Seiler & Batz. Respondents maintained a single open book account in the name of Seiler & Batz. All payments except the last one were made by checks drawn on Seiler & Batz' bank account. Mr. Orlopp testified that in making credits to the account for payments, "We assumed that the first eggs shipped were the first eggs paid for." It was his intent in keeping the running account that when a payment came in it was to be applied to the oldest past-due item on the open running account. When appellant withdrew on March 30, 1961, there was unpaid on the account the sum of $29,679.54. After that date an additional unpaid balance of $13,063.98 accrued, for a total of $42,743.52. However, the balance on the account never fell below the $29,679.54.

The findings pertinent to this appeal are as follows: That there was a joint venture between appellant and Seiler &

Batz; that on March 30, 1961, the unpaid balance was $29,679.54; that this venture was dissolved and the new venture composed of Seiler & Batz and Mid-Valley continued; that appellant and Mid-Valley were undisclosed, or "dormant," participants in the respective joint ventures; that respondents were not informed nor were they aware of the change which occurred on March 30, 1961; that the new venture purchased eggs from the respondents; that the same open book account was charged with this purchase in the amount of $41,294.35; that the new joint venture made payments in the sum of $28,230.27 without directing how the same were to be applied or credited; and that the respondents, without being aware of the change in the joint venture, continued to credit the sums received against the earliest items of the combined accounts of the two joint ventures; and that it was equitable that these payments be applied against the charges in the account which were incurred by the new joint venture.

Thereupon, judgment was entered in accordance with the findings and conclusions as far as appellant was concerned in the sum of $29,679.54, plus interest from June 15, 1961.

Appellant contends that the trial court erred in reapplying the payments made after March 30th so that such became payments for eggs delivered after March 30th instead of before. Its argument is based on section 1479 of the Civil Code, and in particular, subdivision Two thereof, which reads as follows: "If no such application be then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance; except that if similar obligations were due to him both individually and as a trustee, he must, unless otherwise directed by the debtor, apply the performance to the extinction of all such obligations in equal proportion; and an application once made by the creditor cannot be rescinded without the consent of [the] debtor."

Appellant cites *Hollywood etc. Co.* v. *John Baskin, Inc.*, 121 Cal.App.2d 415, 429 [263 P.2d 665], where the court stated that general credits stand as payments on the oldest items unless some other application is clearly indicated. And, where the party entitled to make an application of payment has done so, that application is conclusive. (*White* v. *Costigan*, 138 Cal. 564, 568 [72 P. 178].)

Thus, appellant claims that since respondents had made an application of the payments to the oldest items on the open

book account in the name of Seiler & Batz, that application is conclusive and effectively extinguished the obligations on that account for eggs purchased prior to March 30th; except that it admits there is an unpaid balance of $2,262. It relies on *Nuckolls* v. *Bank of California,* 10 Cal.2d 278, where the Supreme Court said at pages 287-288 [74 P. 2d 271]:

"The situation here is much like that shown to have existed in the case of *Anderson* v. *Northwestern Trust Co.,* 184 Minn. 200 [238 N.W. 164]. In its decision of that case, the court rules as follows: 'So payments and application thereof were facts accomplished and made in accordance with the directions of the debtor and under the law applications made were rightful and legal when made. The then undisclosed equities, if any, of the plaintiff would not overturn what had rightfully been done. In *Pond & Hasey Co.* v. *O'Connor,* 70 Minn. 266 [73 N.W. 159, 160, 248], this court said: "It is the rule that the application once rightfully made by either party is conclusive and final. Also that the law will not disturb an application once made by the parties." ' A reasonable application of this rule to the facts in the present case renders it necessary to hold that as the funds in question were applied according to the agreement between the debtor and the creditor without any knowledge on the part of the creditor of the equities of a third party, 'the law will not disturb an application once made by the parties.' "

Citing *Hart, Schaffner & Marx* v. *Vaughn,* 17 Cal.App.2d 516 [62 P.2d 377], the appellant argues that the creditor is prevented from changing an application once made where the rights of third parties are concerned, claiming that appellant is now a third party, and has been since March 30, 1961.

However, the relations of joint venturers as between themselves and as to third parties are generally the same as those of partners and to the extent they are the same, the law of partnerships applies to both. (*Zeibak* v. *Nasser,* 12 Cal.2d 1, 12 [82 P.2d 375]; *Grant* v. *Weatherholt,* 123 Cal.App.2d 34 46 [266 P.2d 185]; 3 Witkin, Summary of Cal. Law, §§ 9-12, pp. 2271-2276.) Thus, appellant was in the position of an undisclosed or dormant partner in the joint venture between it and Seiler & Batz, and as a dormant partner, is fully as liable as an ostensible partner for the firm's debts. (*Gardiner* v. *Gaither,* 162 Cal.App.2d 607, 618 [329 P.2d 22]; *Engineering etc. Corp.* v. *Longridge Inv. Co.,* 153 Cal.App.2d 404, 413 [314 P.2d 563].)

In *Bissell* v. *King,* 91 Cal.App. 420, the court said at page 423 [267 P. 356]: ". . . a partner's liability is measured not

by the impression a third party dealing with the partnership may have respecting his interest in the partnership, but is measured by the fact whether or not he is a partner. Thus in cases of secret partnership and dormant partners, a creditor is entitled to recover from all the partners when discovered, though the debt was not originally charged to all . . . ."

When appellant withdrew from Seiler & Batz the firm was dissolved and its successor, which includes Mid-Valley, was a new entity. (Corp. Code, § 15029; *Ellingson* v. *Walsh, O'Connor & Barneson,* 15 Cal.2d 673, 676 [104 P.2d 507].) Appellant nevertheless remained liable for the old firm's debts. (Corp. Code § 15036.)

█ Respondents' bookkeeping entries in the single running account for the two successive joint ventures, made in ignorance of the fact that there were two primary debtors owing different amounts, did not legally determine how the payments should be applied. Respondents properly maintain that there were in truth two primary debtors and hence, two accounts, and that respondents' bookkeeping treatment of the payments received cannot be regarded as conclusive of the equities involved. Respondents could not have made such an election as to how to apply the funds when the facts giving rise to the election were purposely withheld. █ Respondents rely on *Wells, Fargo & Co.* v. *Robinson,* 13 Cal. 133, where the Supreme Court said at pages 141-142:

"This doctrine of election has been a vexed subject of jurisprudence. Judge Story, vol. 2, (Jur.) Sec. 1097, says: 'Questions have also arisen in Courts of Equity, as to what acts or circumstances should be deemed an election on the part of the person bound to make it. We say acts or circumstances; for positive acts of acceptance or of renunciation are not indispensable. Presumptions equally strong may arise from long acquiescence, or from other circumstances of a stringent nature. Upon such a subject no general rule can be laid down; but every case must be left to be decided upon its own particular circumstances, rather than upon any definite abstract doctrine. Before any presumption of an election can arise, it is necessary to show that the party acting, or acquiescing, was cognizant of his rights. When this is ascertained affirmatively, it may be further necessary to consider whether the party intended an election; whether the party was competent to make an election; for a *feme covert,* an infant, or a lunatic, will not be bound by an election; whether he can restore the other persons affected by his claim to the same situation as if the

acts had not been performed, or the acquiescence had not existed; and whether there has been such a lapse of time as ought to preclude the Court from entering upon such inquiries, upon its general doctrine of not entertaining suits upon stale demands, or after long delays.

"Questions have also arisen in Courts of Equity, as to the time when, and the circumstances under which, an election may be required to be made. The general rule is, that the party is not bound to make an election, until all the circumstances are known, and the state, and condition, and value of the funds, are clearly ascertained; for, until so known and ascertained, it is impossible for the party to make a discriminating and deliberate choice, such as ought to bind him to reason and justice. If, therefore, he should make a choice in ignorance of the real state of the funds, or under misconception of the extent of the claims on the fund, elected by him, it will not be conclusive on him. And, on the other hand, he will be entitled, in order to make an election, to maintain a bill in equity for a discovery, and to have all the necessary accounts taken to ascertain the real state of the funds."

In volume 2 of Pomeroy's Equity Jurisprudence, 5th edition, section 512, at pages 441-442, it is stated: "Subject to the above-stated limitations [as to the time when an election must be exercised], it is a well-settled rule of equity that a person bound to elect has a right to become fully informed of and to know all the facts affecting his choice, and upon which a fair and proper exercise of the power of election can depend. . . . It follows that where an election has been made in ignorance or under a mistake as to the real condition and value of the properties, or under a mistake as to the real nature and extent of the party's own rights, such a mistake is regarded as one of fact, rather than of law; the election itself is not binding, and a court of equitable powers will permit it to be revoked, unless the rights of third persons have intervened which would be interfered with by the revocation."

The rule is summarized in 17 California Jurisprudence 2d, Elections of Remedies, section 8, page 230, as follows: "The doctrine of election is applicable only when the party is cognizant of all the facts. If he commences an action in ignorance of substantial facts that would proffer an alternative remedy, and the knowledge of which is essential to an intelligent choice of procedures, his action is not binding, and he may, when informed, adopt a different remedy."

■ The proper application of credits is discussed in

*Irvine & Muir Lumber Co.* v. *Holmes,* 26 Cal.App. 453 [147 P. 229]. This involved a balance due where a partnership had owed the plaintiff funds prior to its dissolution and payments made after such. The trial court gave judgment to the plaintiff and the appellate court, in affirming the judgment, said at pages 457-458: "Appellant's contention is that all payments should have been applied to the partnership account, whether made before or after the partnership had ceased. Appellant overlooks the distinction between the account created while the partnership was in existence and the account which ran against White after Holmes had given notice that he would no longer be liable. Here, then, were two classes of obligation, and if section 1479 of the Civil Code has any application it would seem that subdivision 3, paragraph 3, of that section authorized the application made by the court. But if section 1479 does not apply the rule is as stated in *Murdock* v. *Clarke,* 88 Cal. 384, 390 [26 P. 601, 603], that, 'where there are different debts due from the debtor to the creditor, the law will make such application in such manner, in view of all the circumstances of the case, as is most in accordance with justice and equity, and will best maintain the rights of both parties.' The principle thus stated, it seems to us, fully justified the course pursued by the court in applying payments."

Similar situations are discussed in *Bradner* v. *Woods,* 30 Cal.App.2d 678 [87 P.2d 69]; *Firestone* v. *Wahl,* 133 Cal. App.2d 501 [284 P.2d 499]; and *McCarthy* v. *Paris,* 46 Idaho 165 [267 P. 232].

The appellant argues that the respondents failed to make the reapplications as soon as they were discovered. However, respondents did sue the appellant and in the answer filed by appellant and Mid-Valley and even at pretrial, both denied that they were partners in a joint venture with Seiler & Batz.

The appellant cites only one instance as to what could be questioned as a specified application of a payment. On February 22d and 27th, and as set forth on an invoice dated March 14th, the respondents delivered eggs at the price of $10,510.50. At that time there was only a balance of $100 due. On April 13th Seiler & Batz paid the respondents this exact sum ($10,510.50). Between February 22, 1961, and April 13, 1961, there were other purchases that made up the balance then owed. The respondents applied this $10,510.50 on the account.

Civil Code section 1479 does not set forth a mode in which the debtor must direct application of payment. It requires

only that the debtor's intention must be manifested to the creditor.

In *Ray* v. *Borgfeldt*, 169 Cal. 253, 263 [146 P. 679], the court said that the debtor's desires need not be "expressed in writing, or in any technical or formal words, or delivered in any particular manner," and that it is sufficient if the intention is manifest and that it comes to the knowledge of the other party.

We have concluded that the court should have given a credit to the appellant for $10,510.50, and the judgment should be modified and reduced accordingly.

Where the payments seem to be earmarked by amounts, such as drawn in odd dollars and cents, such circumstances are discussed in *F. M. Slagle & Co.* v. *Bushnell*, 70 S.D. 250 [16 N.W.2d 914, 156 A.L.R. 1070], and it was stated at pages 920-921 [16 N.W.2d] : "In *Tayloe* v. *Sandiford*, 7 Wheat. 13, 20 U.S. 13, 20, 5 L.Ed. 384, it was stated : 'A person owing money under distinct contracts, has undoubtedly, a right to apply his payments to whichever debt he may choose; and although prudence might suggest an express direction of the application of his payments, at the time of their being made; yet there may be cases in which this power would be completely exercised, without any express direction given at the time. A direction may be evidenced by circumstances, as well as by words. A payment may be attended by circumstances which demonstrate its application, as completely as words could demonstrate it.' . . .

"As we have indicated, all of the checks we are considering have a common characteristic. They are drawn in comparatively small odd dollar and cent amounts. By this characteristic we think they were plainly earmarked as specific rather than general payments. Through application of the rule of SDC 47.0207 (1) [South Dakota Code, 1939, § 47.0207(1)] appropriation by defendant of most of these checks to particular items unquestionably resulted as a matter of law." (See also *Hamilton Factors Corp.* v. *Winston*, 132 N.Y.S.2d 458.)

The appellant did not offer in evidence the check or the check stub to indicate what the payment was for. However, the invoice, dated March 14th, does show a handwritten notation that it was paid. The location of the entries and the exactness of the amounts and the entries of charges and payments for the eggs seem clear from an examination of the bookkeeping account kept by the respondents. At the time of the purchase of the eggs in the amount of $10,510.50, the appellant owed only $100, and this was shown as paid from the next item

of credit on March 7th. The credit immediately thereafter is the $10,510.50 item. Appellant is entitled to a credit in that sum.

The appeal from the order is dismissed.

The judgment is modified by reducing the same by $10,510.50, and as so modified the judgment is affirmed.

Conley, P. J., and Stone, J., concurred.