[S. F. No. 9350. In Bank.—June 2, 1922.]

GEARY STREET, PARK AND OCEAN RAILROAD COMPANY (a Corporation), Appellant, v. JAMES ROLPH, Trustee, et al., Respondents.

[1] AGENCY—CONTRACTS IN NAME OF AGENT—LIABILITY OF PRINCIPAL. A principal is responsible to third persons for the ordinary contracts and obligations of his agent with third persons made in the course of the business of the agency and within the scope of the agent's powers as such, although made in the name of the agent and not purporting to be other than his own personal obligation or contract.

[2] ID.—EXCEPTION TO GENERAL RULE.—A well-recognized exception to the general rule is that a principal cannot be held liable when the third person knows that he is dealing with an agent and knows who is the principal, and elects to hold the agent rather than the principal.

[3] ID.—LIABILITY OF PRINCIPAL—KNOWLEDGE BY CONTRACTING PARTY. The mere fact that the principal is known to the third person at the time he contracts with the agent does not prevent such third person from holding the principal liable on the contract made in the name of the agent.

[4] CORPORATIONS—UNPAID SUBSCRIPTIONS FOR STOCK—ASSESSMENT FOR —BASIS OF LIABILITY.—It is not necessary to the enforcement by a corporation of an assessment for an unpaid portion of subscriptions for stock that the insolvency of the corporation, or its inability to pay its debts, should appear, for the liability exists under the general principles of law. Where insolvency in fact exists and the liabilities for these calls constitute the whole corporate assets, it is the duty of the corporation to resort to them for the payment of its debts, and if it fails in that respect, its creditors may do so.

[5] ID.—TRANSFER OF STOCK TO AGENT—VALIDITY OF.—The liability in favor of a corporation for calls upon its unpaid stock against

the principal, where the stock stands in the name of an agent as trustee, assumes the validity of the transfer to the trustee, the liability of the principal being based upon the doctrine that he is liable to third persons on any valid obligation incurred by the agent in carrying out the business of the agency.

[6] ID.—AGENCY TO HOLD STOCK—LEGALITY OF RELATION.—The relation between a principal and his agent to whom stock of a corporation has been transferred in trust for the principal is perfectly lawful and its lawfulness is not affected by the fact that the principal could not maintain any right as a stockholder to participate in the management of the corporate affairs at stockholders' meeting, or to inspect its books, except through the medium of the agent and trustee.

[7] ID.—SECTION 324 OF THE CIVIL CODE—CONSTRUCTION.—Section 324 of the Civil Code, providing that a transfer of corporate stock is not valid, except as to the parties thereto, until the same is entered on the books of the corporation, does not impair or destroy the corporation's right to pursue the real owner of stock for the amount of a call for an unpaid subscription formally and technically made upon his agent in whose name the stock stands as trustee.

[8] ID.—MATERIAL ISSUES—OWNERSHIP—AGENCY—FINDINGS.—The real owner of stock of a corporation which stands in the name of his agent as trustee is liable for a call for an unpaid subscription for the stock, and in an action by the corporation therefor the ownership of the stock and the agency are facts material to the plaintiff's case and it is error for the trial court to fail to find such facts.

[9] ID.—UNPAID SUBSCRIPTIONS—CALL BY CORPORATION—RULE.—The prevailing rule, with regard to calls made by a corporation itself on unpaid subscriptions, for additions to its working capital, is that they must be equal, so that when all have paid the call, all the stockholders included in the call will have paid the same amount on each share of their stock subjected to the call.

[10] ID.—SUIT BY CREDITORS—LIABILITY—CONTRIBUTION.—Where creditors proceed by bill in equity to apply the unpaid stock subscriptions to the payment of corporate debts, each is liable for the full amount unpaid on his subscription and any inequality resulting from the proceeding is adjustable only by suits for contribution between the respective stockholders.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. George A. Sturtevant, Judge. Reversed.

8. Unpaid stock subscription as reachable by creditor's bill, note, Ann. Cas. 1914B, 958.

The facts are stated in the opinion of the court.

Pillsbury, Madison & Sutro, Alfred Sutro and Eugene M. Prince for Appellant.

William M. Abbott, William M. Cannon, K. W. Cannon, O. K. McMurray and E. J. Foulds for Respondents.

SHAW, C. J.—This is an action by the plaintiff to recover of defendants the amount due from them upon an assessment or call for a portion of the unpaid subscription price of its corporate stock, amounting to $54,876 upon 1,614 shares of the stock. The action was begun in 1916, in the lifetime of Robert F. Morrow, against James Rolph, as trustee, and said Robert F. Morrow. On June 3, 1918, Morrow died. Thereupon his executors were substituted as defendants in his stead and a claim for that amount was duly presented to them for allowance and was, by them, rejected. Whereupon, the action proceeded to trial and judgment for the defendants. The plaintiff appeals.

The complaint alleges the number and value of the shares of the plaintiff's capital stock; that its par value is $100 per share; that only $37.50 had been paid thereon; that a call had been regularly made on the stockholders for the payment of an additional sum of $34 per share thereon for the purpose of raising money wherewith to pay its debts; that it has no assets with which to do so other than the liability of the stockholders for the unpaid balance of the stock value, and that it had duly elected to collect the amount called for by action instead of by sales of the stock. It then alleged that Robert F. Morrow was, at the date of the call, and had been ever since July 17, 1902, the owner of 1,614 shares of said stock, which shares at all times mentioned had stood, and still stood, in the name of James Rolph, trustee, on the books of said corporation, and for which, prior to July 17, 1902, certificates had been issued in the name of James Rolph, trustee, by plaintiff at the request of said Morrow, which certificates were by plaintiff delivered to Morrow and which he accepted and which he at all times thereafter owned; that said Rolph never had any interest in or title to the stock, and that Morrow, as such

owner, had demanded and received from the plaintiff all the dividends declared by the plaintiff on said stock. The answer admitted that the said shares stood in the name of Rolph, as trustee, and that certificates had been issued to him in his name by the plaintiff, but denied the ownership thereof by Morrow, the receipt of any dividends thereon by him, the delivery of the certificates to Morrow and the acceptance thereof by him.

The court made findings showing that the plaintiff had issued the amount of stock aforesaid; that only $37.50 had been paid on the par value of ninety per cent thereof; that $47.50 had been paid on the remaining ten per cent, and that the call had been regularly made, as alleged, for $34 on each share of the entire stock. The findings also state that the 1614 shares of stock in controversy were issued to James Rolph, trustee, and at all times stood on plaintiff's books in that name. No findings in response to the allegations of ownership by Morrow were made. The findings merely state that the shares were not issued in the name of James Rolph, trustee, at the request of Morrow, and that they were not delivered by plaintiff to Morrow or accepted by him. The failure of the court below to find upon the allegation of ownership was evidently based on the theory that Morrow could not be the owner of stock, so as to become liable to the corporation or its creditors for calls thereon for unpaid subscriptions, unless it stood on the corporate books in his name, or unless the corporation had in some manner and with his consent recognized him as the holder thereof, and that the facts that he was the beneficial owner and the record holder his agent or trustee to hold the stock in that manner for his use and benefit, were immaterial.

It was further found that it is not true "that said Robert F. Morrow, otherwise than as the agent or representative of said James Rolph, Trustee, demanded or received from plaintiff any dividend or dividends on said stock or any thereof." Technically the finding that the dividends were not received "from plaintiff," except as to one or two of them, is correct. But if it was intended as a finding that Morrow had never received for his own use and benefit any of the dividends declared and paid by plaintiff on the stock, it is directly contrary to the undisputed evidence. The evidence shows that 116 dividends were declared and paid

after May 26, 1885, the date when the first 400 of the 1,614 shares were issued to Rolph, trustee. The dividends were uniformly paid by means of checks payable to James Rolph, trustee. Rolph testified that he had regularly received these checks, that the same were usually delivered to him by Morrow, or by someone for him, that he always indorsed these checks to the order of Morrow at once and redelivered the same to him, and that he had never received or kept any of said checks for his own personal use. This evidence was not contradicted or in any manner impeached.

The plaintiff assigns as error the failure to find the facts in regard to the allegations of ownership. An examination of the record shows that there was abundant evidence to justify a finding that Morrow was at all times after its issuance the real and actual owner of this stock and that in taking and holding it in his own name Rolph was acting solely as agent for Morrow and for the exclusive use and benefit of Morrow. In addition to the testimony of Rolph, as aforesaid, the testimony of Morrow himself, although evasive in the extreme, was sufficient to warrant the conclusion, beyond doubt, that he was the real owner. It follows that if such ownership and agency are material to the right of the plaintiff to recover, or if the facts show such relations between Morrow and the corporation as to make him liable for calls for unpaid subscriptions, the failure to find such facts was error which requires a reversal of the judgment. Two questions are thus presented: 1. Whether or not a call for unpaid subscriptions of stock, made for the purpose of obtaining money necessary to pay the debts of an insolvent corporation, can be recovered by the corporation from one who is the real owner of stock which stands on the books of the corporation in the name of another as trustee or agent, the trust or agency being for the sole purpose of holding the stock for the use and benefit of the real owner; 2. Whether or not the conduct of Morrow with respect to this stock and the corporation put him in such relation or privity with the corporation as to make him directly liable to it for such calls.

It will not be necessary to consider the second question. We are of the opinion that under the facts of this case Morrow became liable to the corporation for the call in question.

Rolph held the legal title to this stock. It was registered on the corporate books in his name as trustee. Morrow's ownership was not disclosed by the registry. But Rolph held it solely for the use of Morrow and as Morrow's agent for that purpose. As such holder Rolph assumed the obligation to the corporation to pay the balance remaining unpaid upon the subscription price, which, in the absence of any contrary showing, is presumed to have been the par value. He assumed this obligation in carrying out his agency and it came within the scope of his powers as such agent.

[1] It is a settled rule of the law of agency that a principal is responsible to third persons for the ordinary contracts and obligations of his agent with third persons made in the course of the business of the agency and within the scope of the agent's powers as such, although made in the name of the agent and not purporting to be other than his own personal obligation or contract. "It is thoroughly well settled in the law of agency that when a simple contract, oral or in writing, other than a negotiable instrument, is in fact entered into by one of the parties as the authorized agent of another, but in his own name, and without disclosing to the other party the name of the principal, or even the fact that he is contracting as agent at all, the other party to the contract, while he has a right to sue the agent on the contract, may, at his option, maintain an action against the undisclosed principal, when discovered." (1 Clark & Skyles on Agency, sec. 457, p. 1006. See, also, Story on Agency, sec. 446; 2 Mechem on Agency, sec. 1710.) The following cases in this state enforce or announce this rule: *Ellis* v. *Crawford,* 39 Cal. 526; *Thomas* v. *Moody,* 57 Cal. 219; *Goss* v. *Helbing,* 77 Cal. 190 [19 Pac. 277]; *Puget S. L. Co.* v. *Krug,* 89 Cal. 244 [26 Pac. 902]; *Ferguson* v. *McBean,* 91 Cal. 72 [14 L. R. A. 65, 27 Pac. 518]; *Bergtholdt* v. *Porter B. Co.,* 114 Cal. 689 [46 Pac. 738]; *Schader* v. *White,* 173 Cal. 445 [160 Pac. 557]; *McKee* v. *Cunningham,* 2 Cal. App. 688 [84 Pac. 260]; *Walton* v. *Davis,* 22 Cal. App. 459 [134 Pac. 795]; *Eldridge* v. *Mowry,* 24 Cal. App. 186 [140 Pac. 978].

It has been said in some cases that this rule does not prevail when, at the time the contract is entered into, the principal is known. In *Ferguson* v. *McBean, supra,* the court, in the course of its discussion, said: "It is undoubtedly

true that when the principal is undisclosed he may sue or be sued, but not when he is known, and especially not when he is present at the making of the contract.'' But the court was there considering the question whether or not one Bills was interested in or bound by a written contract executed by McBean alone, upon negotiations conducted by plaintiff with both McBean and Bills in which the interest of Bills, if any, was fully disclosed. The decision was based on the conclusion that the plaintiff deliberately chose to take the contract of McBean alone instead of a contract by both, and that under the peculiar circumstances of the case parol evidence could not be received to show an intent to deal with both so as to make Bills liable as an interested party, because it would violate the rule that parol evidence is inadmissible to vary the terms of a writing. The above-quoted statement was not necessary to the decision, nor was the decision based on it. [2] The rule is subject to the well-recognized exception that the principal cannot be held liable when the third person knows that he is dealing with an agent and knows who is the principal, and elects to hold the agent rather than the principal. (1 Clark & Skyles on Agency, secs. 459, 461, 462.) It was to this proposition that the above statement was leading.

In this case the exception stated in some cases, that the rule cannot be applied when the contract is in writing, is of no importance, for the liability of Rolph for the unpaid subscription is not evidenced by a written agreement to that effect, but arises from his relation with the company as a stockholder. (*Rhode* v. *Dock Hop Co.*, 184 Cal. 376 [12 A. L. R. 437, 194 Pac. 11].) It does not appear that the corporation was informed, at the time Rolph became the holder of the stock, that he was holding it for Morrow, as agent or otherwise, nor that it has ever endeavored to enforce the obligation against Rolph, instead of Morrow, or otherwise elected to hold Rolph liable therefor in place of Morrow.

[3] We are also of the opinion that the better reason, as well as the weight of authority, is against the proposition that the mere fact that the principal is known to the third person at the time he contracts with the agent prevents such third person from holding the principal liable on the contract made in the name of the agent. We treat this

189 Cal.—5

point because upon a new trial it may appear that the agency was fully known to plaintiff. That the principal is not liable in such a case if the circumstances, or the terms of the contract, or the two combined, show an intent by the other party to take the agent as his debtor or obligor, in preference to the principal, is, as we have said, well established, and it is manifestly in accordance with reason and justice. In such a case the election takes place at the time of the making of the contract. But where no such election or intent appears, and there is nothing more than a contract made in the name of the agent, knowing him to be such and with knowledge of the identity of his principal, the case is, and should be, governed by the well-known principle that he who acts by another acts by himself, that the contract of the agent, within the scope of his authority, is in legal effect the contract of the principal. The Civil Code states that ''an agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and *liabilities which would accrue to the agent* within such limit, if they had been entered on his own account, *accrue to the principal.*'' (Sec. 2330.) Here Rolph was engaged by Morrow to register Morrow's stock in his, Rolph's, own name, and hold it for the use of Morrow. It was a necessary incident of such agency that Rolph should assume in his own name the obligation to pay up, on call, the balance of the stock subscription. He was, therefore, authorized by Morrow to assume such obligation. If Rolph had entered into this relation on his own account the liability for the calls would, of course, have ''accrued'' to Rolph. Consequently, under the rule of section 2330, the liability to respond to such calls ''accrued to the principal,'' Morrow.

The authorities fully support this conclusion. Mr. Story says: ''The liability of the principal to third persons upon contracts made by his agent, within the scope of his authority, is not varied by the mere fact, that the agent contracts in his own name, whether he discloses his agency or not, provided the circumstances of the case do not show that an exclusive credit is given to the agent.'' And he extends this doctrine to written contracts. (Secs. 446, 446a.) And as to the exceptions, he says: ''The exceptions to this liability of the principal may easily be gathered from what

has been already stated. If the principal and agent are both known, and exclusive credit is given to the latter, the principal will not be liable, although the agent should subsequently fail; for it is competent to the parties to agree to charge one, exonerating the other; and an election, when once made, is conclusive and irrevocable." (Sec. 447.) "Sometimes a subscription for stock is made by one person in his own name, but really he is acting as the agent of another, and the stock is entered on the corporate books in the name of the agent. In such a case it is the rule that corporate creditors may hold either the principal or the agent responsible on the stock." (1 Cook on Corporations, sec. 249.) "In America the relation of the real owner to the 'dummy' is held to be that of principal and agent, and the principal is held liable, on the ground that an undisclosed principal is liable on the contracts of his agent." (1 Cook on Corporations, sec. 253.) In Clark & Skyles on Agency, it is said that the doctrine stated might seem to be "opposed to the general principle of the law of contracts, that a contract cannot impose a liability upon a person who is not a party to it, but this principle is held inapplicable because of the doctrine of the identity of principal and agent. The principal, although not named in the contract or disclosed at all, is regarded as having become a party thereto through the agent. The minds of the parties meet because, as was said in substance in a New York case, the agent's mind is his undisclosed principal's mind." The reference is to *Kayton* v. *Barnett*, 116 N. Y. 627 [23 N. E. 24].

An examination of the decisions of the subject show that the idea that the principal cannot be held liable in cases where the third person, at the time of contracting, knew the principal and his relation to the transaction, arises from the unfounded assumption that, since the decisions holding the principal liable when the contract does not disclose his name or interest, refer to him as the "undisclosed principal," the doctrine does not prevail when he is known. But this language is used because the principal was insisting, not that he is not liable when he is known, but that he is not liable when the contract does not on its face purport to bind him, or to be for his behoof or benefit. It is this circumstance that is referred to by the word "undisclosed."

The principal would have no standing in court to say he is not liable when his authorized agent makes a contract purporting to be for him and the party taking it had full knowledge of the fact that it was for him. The liability when he is undisclosed does not arise from his not being known, although sometimes fraud from that fact is also involved, but from the fact that the contract of his authorized agent, though not in his name, is really for his benefit and in his business. Thus Mr. Mechem says: "The principal is also liable on all informal contracts entered into on his account and by his authority and not expressly made on the agent's responsibility rather than the principal's. . . . Where a person is known to be acting as the agent of a disclosed principal, the presumption is that the principal and not the agent is to be bound." (2 Mechem on Agency, sec. 1710; see, also, sec. 1717.)

[4] It is not necessary to the enforcement of this liability that the insolvency of the plaintiff corporation or its inability to pay its debts should appear, for the liability exists under the general principles of law. In this case, however, the insolvency does not appear and these liabilities for calls are not only part of the corporate assets, but they constitute the whole thereof. It is the duty of the corporation to resort to them for the payment of its debts, and if it fails in that respect, its creditors may do so. (*Sanger* v. *Upton*, 91 U. S. 60 [23 L. Ed. 220, see, also, Rose's U. S. Notes]; *Baines* v. *Babcock*, 95 Cal. 581 [29 Am. St. Rep. 158, 27 Pac. 674, 30 Pac. 776]; *Rhode* v. *Dock Hop Co.*, 184 Cal. 378, 379 [12 A. L. R. 437, 194 Pac. 11].) There are many cases holding that where the corporation is insolvent, the creditors have the benefit of the liability of the real owner of stock held on the books of the corporation in the name of an agent, disclosed or undisclosed, but really for the benefit of the real owner. Among them are the following: *Brown* v. *Artman*, 166 Fed. 485; *Brown* v. *Huey*, 166 Fed. 483; *Kurtz* v. *Brown*, 152 Fed. 374 [11 Ann. Cas. 576, 81 C. C. A. 498]; *American etc. Co.* v. *Kurtz*, 134 Fed. 665; *White* v. *Marquardt*, 105 Iowa, 147 [74 N. W. 930]; *Fell* v. *Securities Co.*, 11 Del. Ch. 234 [100 Atl. 788]; *Gordon* v. *Cummings*, 78 Wash. 519 [139 Pac. 493]; *State ex rel.* v. *Superior Court*, 44 Wash. 108 [87 Pac. 40]; *Cole* v. *Satsop*, 9 Wash. 487 [43 Am. St. Rep. 858, 37 Pac. 700]; *Ohio*

*V. N. Bank* v. *Hulitt*, 204 U. S. 162 [51 L. Ed. 423, 27 Sup. Ct. Rep. 179, see, also, Rose's U. S. Notes].

In opposition to this conclusion, the defendants rely on section 324 of the Civil Code and on the decisions of this court in *People's Home Sav. Bank* v. *Stadtmuller,* 150 Cal. 106 [88 Pac. 280], *Geary Street etc. Co.* v. *Bradbury,* 179 Cal. 46 [175 Pac. 457], and *Visalia etc. Co.* v. *Hyde,* 110 Cal. 632 [52 Am. St. Rep. 136, 43 Pac. 10], which, they claim, prevent the application of such rule in this state.

The provisions of section 324 relating to the question are as follows:

"Whenever the capital stock of any corporation is divided into shares, and certificates therefor are issued, such shares of stock, . . . are personal property, and may be transferred by indorsement by signature of the proprietor . . . and the delivery of the certificate; but *such transfer is not valid, except as to the parties thereto, until the same is so entered on the books of the corporation* as to show the names of the parties by whom and to whom transferred, the number of the certificate, the number or designation of the shares, and the date of the transfer."

It is claimed by the defendants that this provision forbids and prevents the existence of any liability for calls upon unpaid stock in favor of the corporation against anyone except the registered owner. It will be seen from the language of the section that it does not purport to declare anything concerning the liability of a stockholder for the unpaid part of the subscription price. It relates exclusively to transfers of shares of stock and to the things necessary to make such transfers valid as to other persons than the transferor and the transferee. We are not here concerned with the validity of the transfer of the stock to James Rolph, trustee, as between him and the person who transferred it to him. The record does not show how or from whom Rolph received the stock. The theory upon which the plaintiff here is allowed to choose to resort to the liability of the principal for the obligations of his agent is not based upon the proposition that the transfer of this stock to Rolph as trustee for Morrow was invalid. [5] On the contrary, it assumes the validity thereof, and places the liability of Morrow upon the doctrine already stated, that the principal is liable to such third person on any valid obligation

incurred by the agent to such person in carrying out the business of the agency. There is nothing in the provisions of section 324, or in any other provision of the code, that in any manner relates to or affects the right which the corporation would have, under the general principles of law, to enforce against the principal the obligation incurred by the agent. Such right depends on the relation of principal and agent existing between Morrow and Rolph with respect to the stock. [6] That relation is perfectly lawful and its lawfulness is not affected by the fact that Morrow could not maintain any right as a stockholder to participate in the management of the corporate affairs at stockholders' meetings, or to inspect its books, except through the medium of Rolph as his agent and trustee. The right of the corporation to pursue Morrow for Rolph's liability is not at all inconsistent with the absence of any right in Morrow to personally act in or control the corporate business. The provisions of section 324, therefore, do not constitute a defense to this action.

[7] We find nothing in the decisions cited by the defendants which gives to section 324 the effect claimed for it, or which impairs or destroys the plaintiff's right to pursue Morrow for the amount of the call formally and technically made upon Rolph as holder of this stock.

*People's Home Sav. Bank* v. *Stadtmuller, supra,* is the leading case in this state on the subject. In that case the plaintiff attempted to enforce an unpaid call by action against Anna Stadtmuller. The stock had been subscribed for and had been issued to F. D. Stadtmuller, her husband, in his lifetime, and he died the owner thereof. Upon the settlement of his estate the certificates and title thereto were distributed to said widow. She accepted the certificates and retained the same, but never caused the transfer thereof to her to be entered on the books of the corporation, nor otherwise assumed the relation of a stockholder with the plaintiff. The corporation about that time became insolvent and shortly afterward duly made a call for the unpaid portion of the subscription price of the stock. The court said that where stock had been transferred from the record holder to another who does not cause the transfer to be registered, "or in some way equivalent in the eye of the law, establishes the relationship of stockholder between

himself and the company, and is thus accepted by the company as a substituted stockholder for the original holder," the corporation "has no right of action against the transferee, because, as between him and the corporation, the contractual relation of stockholder has not been created." It will be seen that there had been no agency of the husband to hold the stock for his wife, the corporation did not attempt to enforce the original subscription of the husband as her agent or in his own behalf, but was proceeding solely to enforce the obligation which it claimed had been created by implication of law against the wife upon the acceptance by her of the stock distributed to her. There was no suggestion or claim that she was liable as principal for the obligation of her agent incurred for her in the course of his business as such agent. That question did not arise and the decision does not affect it in any manner.

In *Visalia R. R. Co.* v. *Hyde, supra,* the stock was entered on the corporate books in the name of Hyde, but before the making of the call thereon he had sold it to another person and had indorsed and delivered the certificate to that person. That transfer, however, had not been entered on the corporate books. It was held that the defendant was liable for the call, notwithstanding the previous sale and the fact that he was not the owner thereof when the call was made. The mere statement of the facts shows that the right of the corporation to sue the principal for an obligation assumed in his behalf by his authorized agent was not involved in the case. In *Geary Street etc. Co.* v. *Bradbury, supra,* it is said incidentally in the course of the argument that a purchaser of stock not fully paid up does not become liable to the corporation for calls thereon until in some manner he comes into privity with it as a stockholder. But the defendant in that case was the registered owner of the stock at the time the call was made, which, it may be remarked, was the same call as is here involved, and no question of the character here involved and urged was presented or could be presented. These cases, therefore, do not conflict with our conclusion that Morrow became liable as principal.

[8] Upon the foregoing principles we are of the opinion that Morrow became liable to the plaintiff for calls regularly made on the subscription price of this stock, that his ownership of the stock and Rolph's agency were facts material to

the plaintiff's case as alleged, and that the court below erred in failing to find such facts.

The respondent contends that the assessment is invalid because it is unequal in operation. The point is based on the findings that in 1915, when the assessment was made, there were outstanding 10,000 shares of stock of the par value of $100 each, upon ninety per cent of which $37.50 a share was paid up and upon the other ten per cent $47.50 a share was paid up. This would mean that 9,000 shares were paid up to $37.50 a share and 1,000 shares up to $47.50 a share. [9] The prevailing rule, with regard to calls made by the corporation itself on unpaid subscriptions, for additions to its working capital, is that they must be equal, so that when all have paid the call, all the stockholders included in the call will have paid the same amount on each share of their stock subjected to the call. (4 Thompson on Corporations, sec. 3713; 1 Cook on Corporations, sec. 114; 1 Clark & M. on Corporations, sec. 499f; *O'Dea* v. *Hollywood,* 154 Cal. 70 [97 Pac. 1].) [10] Where creditors proceed by bill in equity to apply the unpaid stock subscription to the payment of corporate debts, this rule does not prevail; each is liable for the full amount unpaid on his subscription and any inequality resulting from the proceeding is adjustable only by suits for contribution between the respective stockholders. (*Kaye* v. *Metz,* 186 Cal. 42 [198 Pac. 1049]; 1 Cook on Corporations, sec. 211; *Pentz* v. *Hawley,* 1 Barb. Ch. 123.) While this call and the action to enforce it is really for the benefit of creditors, it is nevertheless a statutory proceeding, and, so far as we are advised, it is uniformly held that such a call by the corporation pursuant to statutory authority is void unless it is made in such manner as to produce no inequality between stockholders. To apply this rule to the present case, for illustration, a call for $34 a share could not be lawfully made on all the shares, if some of them are only $37.50 paid up and others are $47.50 paid up. Hence, under this rule, if the facts are as stated, the call would be invalid.

The only basis for the finding that 1,000 shares were paid up to the amount of $47.50 a share is the statement in the plaintiff's articles of incorporation, dated November 5, 1878, that the amount of the capital stock is $1,000,000, divided into 10,000 shares of $100 each, that the amount thereof actually

subscribed was 100 shares, that this was more than $1,000 per mile of the length of the road, and that ten per cent thereof had 'been paid in to the treasurer. One hundred shares, it is to be noted, was only one per cent of the total capital stock, not ten per cent, and the remainder thereof was ninety-nine per cent, not ninety per cent. The sum paid in was not $10,000; it was only $1,000. Therefore, the finding that $47.50 was paid up on 1,000 of the shares is not sustained by the evidence.

The effect on the validity of the assessment might perhaps be the same, the inequality would still be manifest, if $38.50 instead of $47.50 per share had been paid on part of the stock assessed and only $37.50 on the remainder. There is evidence, however, showing that the inequality did not exist. The books and records of the corporation were partly destroyed by the great fire of April, 1906. There was uncontradicted evidence, partly secondary and partly derived from books not destroyed, to the effect that the books showed that on May 30, 1879, an assessment was made for $5 a share on the whole 10,000 shares of capital stock and that it was on that day paid to the treasurer and credited thereon to the respective stockholders, amounting to $50,000, and that the next credit entry on the book was "June 4, 1879, Franchise (S. C. Bigelow) $1,000." Bigelow was the treasurer. It was also shown by like evidence that thereafter on the same books follow credits to the respective holders of all the stock for payments of seven other assessments, made at monthly intervals thereafter, six for $5 a share and one for $2.50 a share, the whole amounting to $375,000, or $37.50 on each of the 10,000 shares; that neither the $1,000, nor any part thereof, was credited to the original subscribers, or to any stockholder, as a payment on his stock, nor credited as a payment on account of capital stock at all, but only as "Franchise." This evidently refers to the franchise obtained by filing the articles of incorporation, for the recital in the articles was obviously made to show compliance with the provisions of the Civil Code requiring that before such articles are filed by any railroad corporation stock must be subscribed to the amount of $1,000 for each mile of road (section 293), and that "there must be paid for the benefit of the corporation, to a treasurer elected by the subscribers, ten per cent of

the amount subscribed.'' (Section 294.) The articles do not expressly say that the ten per cent paid in to the treasurer was paid by the ten persons named therein as subscribers, or either of them, or in their behalf. The inference from all this . is very strong either that the $1,000 was paid by some person on behalf of all the persons who then and afterward took up all the stock, and was afterward refunded to him, or that before any assessment was made it was in some way equalized so that all were liable to calls in equal amounts per share. The fact that each of them, or their successors in interest, within fifteen months after the filing of the articles voluntarily paid eight separate calls of the same amount upon each share, amounting in all to $375,000, without raising any objection on account of inequality, coupled with the fact that said evidence also shows that for thirty-five years following, up to the year 1915, when the present · call was made, the books of the corporation continuously carried charges amounting to precisely $625,000 against said stockholders, as balances unpaid on the subscription price of their capital stock, and credits amounting to exactly $375,000 to said stockholders for payments made by them thereon, instead of $376,000, as it would have been if the $1,000 had not been in some way refunded, is very persuasive, if not conclusive, proof that this ''franchise'' payment was either repaid out of the general funds of the corporation to the person or persons who paid it, credited in the collection of the subsequent calls, or otherwise adjusted, so as to equalize the matter between all the stockholders. The record shows that the court below, in its consideration of the evidence, assumed that $10,000 was paid in on the 1,000 shares subscribed before the filing of the articles. This, in effect, was considering a fact which was not true and which was not in evidence. It constitutes error in character the same as the receiving of incompetent evidence, or as an erroneous interpretation of the effect of a writing on a material matter. With this erroneous idea, as to the amount paid in, the court would not give the same weight to the above-mentioned strong circumstantial evidence of a subsequent return or distribution of the comparatively small sum of $1,000 actually paid and of the consequent equalization of the amount paid per share by the several stockholders. The

entry of "Franchise $1,000" would be wholly without significance and there would be nothing to explain the absence of any account of the $10,000. In so far as the possible inequality of $1 per share on 1,000 shares might be sufficient to support the judgment, if that fact had been found, or in so far as the finding of a larger inequality could be regarded as immaterial in view of the actual existence of the smaller one, it would be a judgment based on a fact which the court did not find, and which it is extremely doubtful that it would have found but for the erroneous interpretation of the effect of the evidence as aforesaid. Consequently the judgment should be reversed in order that the trial court may give the due effect to all the circumstances bearing on the point. It may be remarked in this connection that the opinion of the learned judge of the court below is printed in respondent's brief, and that it does not discuss or mention this point, but places the decision for the defendant altogether on the two propositions that Morrow could not be held liable unless he was the registered holder of the stock, and that there was no estoppel to prevent him from denying such ownership.

There is also a finding that ever since its issuance the whole of the capital stock of the corporation plaintiff has been and "is now fully paid up as between plaintiff corporation and its stockholders." Upon this finding the defendant contends that, under section 332 of the Civil Code, no assessment thereon could exceed ten per cent, and, therefore, that the assessment of thirty-four per cent, or $34 a share, is invalid. The finding by its terms implies that the stock is not paid up as between the corporation and its creditors, for whose benefit this assessment was levied, and hence it may be doubtful if it affects that assessment. But we do not think it is sustained by the evidence. The only support for it is an inference drawn from the by-laws adopted in 1878. These by-laws are contradictory on the subject so far as they relate to it all. Section 29 declares that "certificates of stock shall be issued only for fully paid stock." This, it is said, implies that no certificates were afterward issued except for stock that was fully paid up. Section 31 declares that stock shall be transferable on the company books, on proper assignment and delivery to the assignee of "the receipts for the *installments* paid on *such*

*stock*, or the certificates of stock *when* fully paid," but not "until all previous *calls* or installments thereon shall have been fully paid in," nor "unless at least twenty per cent has been paid thereon and receipts issued thereon." This clearly indicates that the stock was not paid up at that time. The subsequent proceedings and transactions and the books of the company repel and destroy all inferences that the stock was issued as paid-up stock, or was, in fact, fully paid. On April 25, 1879, the order for the first assessment of $5 a share was made. It was all paid in full on May 30, 1879. The entry made at the time on the books shows that the entire capital stock had been subscribed for, the names of the subscribers, the number of shares held by each, and the payment by each of them of the $5 assessment on each share held by him. If the stock had been fully paid for previously, as now contended, there would have been a credit in the cash account for $1,000,000 in money paid for the capital stock. But no such credit appears, or ever did appear, and no one has ever claimed that any such payment was ever made. There is no record of the expenditure of such money by the corporation, or of its possession thereof. If that amount of money had been paid to the corporation at that time, there would have been no reason or necessity for any assessment on the stock, or for any issue of bonds. Yet the record shows, as above stated, that calls or assessments on the stock were made and paid monthly from April, 1879, to January, 1880, amounting to $375,000. It also shows that in 1890 the corporation issued bonds to the amount of $484,000, secured by a mortgage covering all of its properties, and that the present assessment was made to raise the money necessary to pay a deficiency judgment entered against the corporation on a foreclosure sale under said mortgage. Also, as already stated, that the stock account carried a charge of $1,000,000 against the stockholders for the aggregate amount owing upon the several stock subscriptions, that this was reduced by the credits for payments on the eight calls made and paid thereon, amounting to $375,000, and that the balance owing from stockholders was thereafter carried on the books at $625,000. It also appears that each of the eight orders or resolutions for the aforesaid calls began with the words: "It is hereby ordered that an assessment upon the *subscribed capital stock*" be levied. If there had been assessments upon

paid-up stock the word "subscribed" would not have been appropriate, and its use shows that the assessment was understood to be upon subscriptions owing, and not as or for a demand for an additional contribution to the corporate assets. The record indicates that the entire investment of the company did not reach the sum of $1,000,000, which, it is now claimed, was paid in by the stockholders at the beginning of its operations. There is no evidence whatever that the stock was ever sold or offered for sale by the corporation at a price less than its par value, or that the certificates originally issued therefor declared that the stock represented thereby was fully paid for. All the certificates to Rolph were issued prior to July 17, 1902. Up to that time, and afterward until 1905, when section 323 of the Civil Code was amended (Stats. 1905, p. 396), stock certificates were not required to show the amount paid thereon, or that anything had been paid thereon. The findings recite that thereafter, in 1907, in transferring certificates for. 356 shares to new holders, the corporation made and issued certificates to the new owner showing on their face that the stock was fully paid. This was not the stock held by Morrow. We are not referred to any part of the record which supports this finding or relates to it. But the evidence we have already mentioned shows that if such statements were made in those certificates, they were not true. This finding was of an evidentiary fact only, and it is not a finding that such stock was fully paid up at that time, nor that any of the certificates held by Morrow in Rolph's name were fully paid up.

For the foregoing reasons we conclude that the judgment of the court below was not in accordance with the law and the facts and that it cannot stand.

The judgment is reversed.

Wilbur, J., Lennon, J., Sloane, J., Lawlor, J., Shurtleff, J., and Waste, J., concurred.

Rehearing denied.

All the Justices concurred, except Lawlor, J., and Wilbur, J., who were absent.

Shurtleff, J., was also absent, and Richards, J., *pro tem.*, was acting.