[Civ. No. 5223. Third Appellate District.—December 5, 1935.]

THOMAS F. RIGNEY, etc., Respondent, v. DE LA SALLE INSTITUTE (a Corporation), Appellant.

[Civ. No. 5224. Third Appellate District.—December 5, 1935.]

THE ELECTRIC CORPORATION OF OAKLAND (a California Corporation), Respondent, v. DE LA SALLE INSTITUTE (a Corporation), Appellant.

[Civ. No. 5225. Third Appellate District.—December 5, 1935.]

WILLIAM MAKIN, Respondent, v. DE LA SALLE INSTITUTE (a Corporation), Appellant.

Rogers, Clark & O'Brien, Webster V. Clark and Sheldon Rutherford for Appellant.

Clyde C. Sherwood, H. A. Dannenbrink and Fernhoff & Sevier for Respondents.

MAXEY, J., *pro tem.*—The plaintiffs are materialmen or subcontractors who furnished labor and material to defendant for the construction and erection of certain buildings at Mount Veeder, in Napa County, California. Each of the plaintiffs

filed separate actions for an alleged balance due for labor and materials furnished. By stipulation, the several actions were consolidated, and were tried as one action. This appeal has been taken by the defendant from the verdict of the jury in favor of three of the materialmen or subcontractors.

The defendant is a corporation, organized and existing under the laws of the state of California and maintained exclusively by the Christian Brothers, a teaching order of the Roman Catholic Church. The buildings under discussion were constructed for the purpose of conducting a training school for novitiates or candidates for admission to their order.

J. P. Brennan was a contractor and had been engaged in the construction business for many years. He was personally known to each of the plaintiffs herein, and they had known and dealt with him as an independent contractor for several years prior to the commencement of the building operations involved herein.

On December 8, 1930, the defendant, De La Salle Institute, hereinafter referred to as the ''Institute'', entered into an agreement with J. P. Brennan, whereby the Institute employed Brennan to act as general manager of construction, and as agent in all matters concerning the proposed work. Brennan secured bids from the various materialmen and subsequently entered into contracts with each of plaintiffs to furnish labor and materials upon this project. The contracts were all made in the name of Brennan, and there is no evidence that the contractual relation between Brennan and the Institute was ever disclosed to plaintiffs until after the completion of the buildings.

Each of the plaintiffs knew that the buildings were being constructed for the Institute and that the Institute was the owner of the property upon which the work was being done. Plaintiffs were to be paid for the labor and materials as the work progressed, and the final payments were to be made to them upon the completion of the buildings. As these progress payments became due, Brennan called upon each of the plaintiffs, requested them to sign a waiver of lien, and stated to each of them that such procedure was necessary in order to secure their money from the bonding or finance company handling defendant's funds. Upon these lien waivers being delivered to Brennan, he secured the money from defendant's representative and made payments to plaintiffs.

There is no testimony that defendant was ever apprised of this procedure. The testimony shows that on occasions, the lien waivers were executed in blank, and later filled in by Brennan or under his direction. At other times, the lien waivers were made out for larger amounts than were then owing to plaintiffs, and that on these occasions, after having executed these lien waivers, and having delivered them to Brennan, he (Brennan) would pay to plaintiffs smaller sums than called for by the lien waivers, and which smaller payments were received by plaintiffs and credited upon the account. Plaintiffs knew, at the time of executing the first lien waivers, that they were to be deposited with some representative of the defendant for the purpose of securing the money claimed to be due to plaintiff upon said job.

Appellant, after starting these building operations, made several attempts to finance them, and was unsuccessful in securing the sums or amount of money necessary for that purpose. It became necessary for the Institute to bond its property, and in that manner conclude the financial part of the building program. These bonds were duly issued and secured by a bond indenture upon the property of the Institute, including the lands upon which the buildings were being constructed. The Bank of America National Trust and Savings Association was named trustee under the bond indenture to disburse the moneys received from the bonds, in accordance with the trust agreement. The bond indenture and trust agreement were duly recorded in Napa County, California. All moneys for the buildings, except a portion paid at the outset of the operation, were paid by and through the trustee upon presentation of the lien waivers by Brennan.

Upon the conclusion of the work plaintiffs issued final receipts and final lien waivers purporting to show that payments in full had been made to each of them for such labor and material. These final receipts and lien waivers were delivered to Brennan, and he received the moneys from the trustee-bank, but did not pay to plaintiffs the balances owing to each of them. The final receipts and lien waivers were executed and delivered on or about November 30, 1931.

On September 26, 1932, the plaintiffs were informed for the first time that Brennan had a contract of employment with the Institute, by the terms of which contract his employment was that of a general manager and agent, and not that of an

independent contractor. The plaintiffs testified that they had at all times assumed that Brennan was employed by the Institute as an independent contractor, and that they had extended credit to him upon that assumption; that they knew nothing about any different contract until in September, 1932.

The testimony further shows that all of the moneys received from the bond issue had been paid out by the trustee, and that there were no moneys due or unpaid to Brennan, save and excepting the sum of approximately $600, being the balance due him personally by the Institute upon his commission, as agreed in his contract of employment. All of the lien waivers presented by Brennan had been paid by the bank to Brennan.

Upon these facts the jury found a verdict in favor of plaintiffs, and upon stipulation of counsel, the amounts claimed by the respective plaintiffs were inserted into the verdict so that it became the verdict of that particular claimant. Judgments were accordingly rendered upon each of the verdicts for each of the several plaintiffs.

The sole and only question presented upon this appeal is: "Was the evidence legally sufficient to sustain the implied finding of the jury that the Institute was the undisclosed principal of Brennan so as to render it liable to the plaintiffs as materialmen or subcontractors?"

It is a settled rule of law in this state that where one deals with another, believing him to be the principal, or subsequently learning that he was dealing with an agent of an undisclosed principal, he may recover either from the person he dealt with, or from the undisclosed principal. (*Hollywood Holding & Dev. Corp.* v. *Oswald,* 119 Cal. App. 21 [5 Pac. (2d) 963]; *Duerr* v. *Sloan,* 40 Cal. App. 653 [181 Pac. 407]; *Colquhoun* v. *Pack,* 32 Cal. App. 97 [161 Pac. 1168]; *Geary St. P. & O. R. R. Co.* v. *Rolph,* 189 Cal. 59 [207 Pac. 539].)

The plaintiffs at all times knew that the Institute was the owner of the land upon which the buildings were being constructed; they knew that the materials were being used to construct buildings for the use of the Institute, and that a representative of the Institute was in attendance during the time of construction. Whatever relation Brennan may have had or borne to the Institute, they knew definitely and positively for whom the labor and materials were being furnished. The plaintiffs further had direct and personal knowledge of

the fact that Brennan had been engaged in the independent contracting business for several years, and were justified in relying upon his ostensible authority as an independent contractor; therefore, in so far as Brennan was concerned, they were justified in furnishing him credit as such a contractor. They had a right to assume that Brennan was an independent contractor. (*Patent Scaffolding Co.* v. *Roosevelt Apts., Inc.*, 171 Wash. 507 [18 Pac. (2d) 857].)

The plaintiffs had no knowledge of the contents of the agreement between Brennan and the Institute until many months after the completion of the work and the giving of the final lien waivers. Until the provisions of this agreement were made known to the plaintiffs they were justified in looking to Brennan for payment, but when the agency of Brennan was disclosed, then plaintiffs were legally entitled to be compensated for their labor and materials by the Institute, unless some other element had intervened to preclude a recovery from such principal.

One of the tests of the rule relative to liability of an undisclosed principal is: Had exclusive credit been extended to the agent? In other words, had plaintiffs done some act which would demonstrate that exclusive credit had been extended to Brennan personally and regardless of whether he was an agent or independent contractor? The testimony upon this point is clear and convincing. Mr. Rigney, one of the plaintiffs, testified as follows: "Q. Well, it is a fact, isn't it, then that you relied on Mr. Brennan's credit, so far as furnishing that work and labor is concerned? A. That is right. Q. And it is also true that you relied exclusively on his credit, didn't you? A. Correct."

Mr. Ayden, the representative of the Electric Corporation of Oakland, testified as follows: "Q. Let me ask you this question, that Mr. Sherwood asked his first witness, and that is whether or not, in furnishing those materials, you gave the credit, which was involved, to Mr. Brennan? A. I gave it to Mr. Brennan, you mean? Q. Yes, you did that exclusively? A. Yes, sir." Also: "Q. And up until that time and during all of the time you were furnishing this material you relied exclusively on the credit of Mr. Brennan as the contractor? A. That is correct. Q. You knew, of course, this job was being built for the Christian Brothers? A. Yes, sir. Q. And you knew that at all times, of course? A. Yes, sir. Q. And

you knew where the material was going to be used? A. Yes, sir.''

Mr. Makin, one of the plaintiffs, testified as follows: ''Q. Is it your testimony upon Mr. Brennan's representation to you that he had to get some money from somewhere, whether it was from what has been called the 'Finance Company' or the 'Brothers', or we will call it the owners, that you executed a lien waiver for an amount (more) than that which was coming to you so he could get that money from his principal? A. I believe that was the story.'' And, also: ''Mr. Clark: Now, it was on the representations of Mr. Brennan, then, that he needed this money for this other purpose, away from the job, that you gave him a lien waiver and receipt, showing that you had received more money than you had coming to you, isn't that true? The Witness: A. Yes, sir. Q. Is that what you said? A. Yes, sir.

There is, however, another point which demonstrates the fact that credit was exclusively extended to Brennan. Each of these plaintiffs had lien rights for the labor performed or materials furnished, and these liens would have priority over any and all other encumbrances against the premises of the Institute, save and excepting similar claims of lien previously filed. Plaintiffs could have compelled the Institute to pay the balance of their claim at any time prior to the execution of the final lien waivers by the several plaintiffs herein. By the execution and delivery of the final lien waivers to Brennan, they accepted the exclusive credit of Brennan for the payment of their indebtedness. Had the final waivers not been executed, the trustee would not have paid Brennan for the amount owing to plaintiffs.

Section 2335 of the Civil Code provides: ''If exclusive credit is given to an agent by the person dealing with him, his principal is exonerated by payment or other satisfaction made by him to his agent in good faith, before receiving notice of the creditor's election to hold him responsible.''

The plaintiffs herein not only accepted Brennan as their debtor, but also extended exclusive credit to him. They further placed in his hands the lien waivers that enabled him to secure the payments from the trustee of the Institute and such payments were in fact made upon the evidences furnished by the plaintiffs, themselves. These facts bring this case squarely within the code provision.

The authorities amply bear out the conclusion that where exclusive credit is extended to the agent, regardless of any agreement by the parties, the rule of liability of an undisclosed principal is inapplicable, and the parties stand in the same relation as if the principal had at all times been disclosed. (*Ferguson* v. *McBean,* 91 Cal. 63 [27 Pac. 518, 14 L. R. A. 65] ; *Geary St. P. & O. R. Co.* v. *Rolph, supra; Rubin* v. *Platt Music Co.,* 92 Cal. App. 203 [268 Pac. 396] ; *Marshall* v. *Bernheim,* 64 Cal. App. 283 [221 Pac. 401] ; *Pacific Ready-Cut Homes, Inc.,* v. *Seeber,* 205 Cal. 690 [272 Pac. 579].)

The case of *Patent Scaffolding Co.* v. *Roosevelt Apartments, Inc., supra,* differs from the instant case in that there is no showing of an exclusive credit having been extended to the agent for the undisclosed principal, the credit was extended to the agent under an ostensible relation of independent contractor, which plaintiffs were entitled to rely upon.

We are, therefore, compelled to conclude that the evidence is insufficient to warrant the implied finding of the jury that the Institute was the undisclosed principal of Brennan, so as to render it legally liable for labor and materials furnished by plaintiffs to him.

The judgment is reversed.

Pullen, P. J., and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 4, 1936, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 3, 1936.