[Civ. No. 17754. First Dist., Div. One. Aug. 6, 1958.]

SAMUEL W. GARDINER, Respondent, v. FLOYD GAI-
THER et al., Defendants; GRAN-WOOD COMPANY
(a Partnership) et al., Appellants.

Julius H. Selinger, in pro. per., for Appellants.

Samuel W. Gardiner, in pro. per., for Respondent.

PETERS, P. J.—In an action for declaratory relief and for a money judgment brought by the assignee of several creditors against numerous defendants, the trial court determined that the three partners of Gran-Wood Company were personally liable for certain goods and services furnished by plaintiff's assignors. From the judgment so holding the three partners appeal.

The record discloses that in November of 1951 there existed a partnership known as the Gran-Wood Company, engaged in the purchase, development and sale of vacant and improved real estate. This company had three partners, H. B. Granlee, John F. Woodson and Julius H. Selinger. At that time there also existed another partnership known as Gaither and Boe, engaged in the contracting business. This partnership had two partners—Floyd Gaither and Carl S. Boe—both licensed contractors.

On November 12, 1951, Gran-Wood entered into a contract with Gaither and Boe. One of the basic questions involved on this appeal is whether such contract created a partnership, or whether Gaither and Boe simply became independent contractors under it. The trial court came to the conclusion that it created a partnership.

Under the terms of this contract Gran-Wood employed Gaither and Boe for the construction of all homes and other structures to be erected upon lands to be acquired by Gran-Wood. Gaither and Boe agreed not to engage in any other contracting work for any other person. In the event that other construction jobs were offered to Gaither and Boe they had to be first submitted to Gran-Wood for approval as to price, time and location, and, if approved, were then to be subject to all the terms of this contract. Gaither and Boe agreed that they would make a firm bid on all construction jobs, and that such bid would be actual cost plus 5 per cent. If the job was completed at a cost less than the firm bid, the cost to Gran-Wood was to be reduced accordingly, and, if the cost exceeded the firm bid, Gran-Wood was to pay Gaither and Boe the amount of such excess up to 5 per cent of the firm

bid. The prevailing customs and usages of the contracting business and related trades as to modes of financing and payments on the installment plan were to be applicable to all transactions under the contract. Title to all lands involved, before, during, and after construction, and until the property was sold, was to remain in Gran-Wood or its nominees. Gran-Wood undertook to use its best efforts, skill and judgment in the selection of land to be developed, and agreed that land acquired by it under the agreement should be carried on its books at its actual cost of acquisition and development. Profits of the venture were to be divided as follows:

"(a) Of the first $40,000.00 of net profits made per annum by Gran-Wood Company, Gaither & Boe shall be credited with 50% thereof.

"(b) If and when net profits of Gran-Wood Company shall exceed $40,000.00 and shall be between $40,000.00 and $50,-000.00, Gaither & Boe shall be credited on the books of Gran-Wood Company with $20,000 per annum plus 10 per cent of any excess over $40,000.

"(c) If and when the aggregate net profits of Gran-Wood Company shall amount to $50,000.00 or more per annum, Gaither & Boe shall, in lieu of formulas (a) and (b) of this paragraph, be credited on the books of Gran-Wood Company with 40% of such net profits."

It was also provided that in addition to sharing in the profits arising out of the construction of dwellings, Gaither and Boe were to share, according to a fixed formula, in the net profits derived from the resale of any land acquired by Gran-Wood and sold by it as undeveloped property.

Granlee and Woodson, two of the partners in Gran-Wood, who were realtors, were to have the exclusive rights to sell for a 3 per cent commission the various properties involved at prices fixed by Gran-Wood and approved by Gaither and Boe.

It was expressly provided that resale prices and selection of vacant or improved property, the terms of sale and financing of such property, and the determination as to the type, cost and suitability of each structure were to be determined by mutual consent. This was to be equally true of all other matters of policy directly affecting the character of the development involved. The contract also provided for a settlement of accounts between the parties as each unit was sold and when the profits therefor became ascertainable with due regard being given to the expiration of lien periods on each project.

The contract contained this provision: "Neither of the contracting parties herein shall be liable to any third person, firm, or corporation for the debt, default or undertaking, contract or tort of the other contracting party, but shall be answerable only for its own acts or omissions."

The contract was to remain in effect for three years, unless either party gave written notice of termination to the other, which each was empowered to do.

In January of 1952, under this contract, Gaither and Boe commenced construction of five houses, on which the firm bid was $13,000 each. About March of 1952 the partners in Gran-Wood learned that the construction was defective in that the foundations and retaining walls were not adequate. Construction was stopped until remedial measures could be taken. The city of San Rafael condemned the structures as unsafe. Following this, and within the time provided by law, a number of subcontractors and materialmen filed mechanics' liens against the property, claiming that both Gaither and Boe and Gran-Wood were personally liable for the amounts involved. Gran-Wood denied any such liability.

Several of the lien claimants assigned their claims to Samuel W. Gardiner, an attorney, and the plaintiff in this action. There then ensued some correspondence between Gardiner and Selinger, also an attorney, and a partner in Gran-Wood. This correspondence ultimately resulted in what the participants called a "deal." The second major disagreement of the parties is whether this "deal" constituted a novation or was a mere executory accord. The trial court held that it was not a novation.

Under the terms of this "deal," as disclosed by the correspondence, Gran-Wood, while disclaiming any personal liability for the debts here involved, offered, and Gardiner on behalf of his clients accepted, a proposition under which Gran-Wood agreed to proceed with salvage operations and completion of three of the five buildings involved, and to demolish the two that could not be salvaged. The mechanics' lien claimants agreed to waive their claim of personal liability against Gran-Wood and its partners and to withdraw or release their liens on the five structures. When the three buildings were completed and sold, there was to be a *pro rata* distribution among the creditors involved.

Pursuant to this agreement, Gran-Wood resumed operations with a new contractor. One of the three buildings was partially completed and sold in an unfinished state. The foun-

dation work was never completed on any of the other buildings because Gran-Wood discovered that the cost would be in an amount that Gran-Wood was unwilling to pay.

Subsequently, Floyd Gaither and Carl Boe were adjudicated to be bankrupts. These two persons, while defendants in the present action in the court below, are not parties to this appeal, since they have not appealed from the judgment.

The trial court found that the lien claims of plaintiff's assignors had become valueless prior to the filing of the present action because the property was of less value than the deeds of trust of Hunter Investment Company, which deeds of trust were prior in right to the lien claims.

The trial court also found that the appellants did not perform the proposals agreed upon in the second contract, and further found that this second agreement was intended as a means of paying the existing claims, and that the proposals contained therein were intended to be prospective in nature and operative at a future time because the parties did not intend that appellants were to be instantly discharged from liability. All the waivers, releases and discharges contained in the agreement were found to have been intended by the parties to be contingent upon actual performance by the appellants of their obligations under the agreement. The court thereupon concluded that the first contract was a partnership contract between Gaither, Boe, Granlee, Woodson and Selinger; that respondent's assignors supplied goods and services under that contract to the partnership, and that the acts of Gaither and Boe were performed as partners and under the partnership agreement. The correspondence between Gardiner and Selinger and the resulting agreement did not constitute a novation. Gardiner was held entitled to a judgment on behalf of his clients and against Granlee, Woodson and Selinger upon a *quantum meruit* in the sum of $5,205.70. Those three persons appeal.

Appellants challenge the conclusion of law that the first contract created a partnership, claiming that there is no evidence and no findings to the effect that this contract created a partnership. The record shows that the parties submitted to the trial court certain issues prior to the main trial. This was a pretrial proceeding before the pretrial procedure as we now know it was authorized by the rules. But even before pretrial counsel could, of course, stipulate to the trial of certain issues to be tried separately from the other issues. That was the legal effect of what was here done.

After these separate issues had been submitted to the trial court, and before the main trial, the court entered a minute order which stated that "two questions were submitted to the Court for its pre-trial decision," and then stated the first question and its answer as follows:

"1. Whether the agreement attached as Exhibit A to the complaint in the above entitled cause constituted a partnership agreement under which H. B. Granlee, John F. Woodson and Julius H. Selinger became copartners with Floyd Gaither and Carl S. Boe or whether said Gaither and Boe became independent contractors under said agreement and whether the members of Gran-Wood Company under said agreement became liable to the creditors of Gaither and Boe.

"This Court has for all practical purposes settled said question in the matter of *Hunter Investment Company* v. *Gran-Wood*, tried in the above entitled Court commencing on January 24, 1956, in which action the identical agreement was before this Court.

"In lieu of a written opinion herein the Court makes reference to the comments of the Court upon the decision in said action contained in the notes of the shorthand reporter."

The minute order then recites that the second question submitted to it was whether the second contract was a novation or executory accord, and answered that question as follows:

"The Court is of the opinion that said correspondence termed by counsel herein as a 'deal' amounts to no more than an accord without satisfaction and without extinction of the obligations theretofore existing and did not approximate the dignity of a Novation.

"The Court inclines to the view that the original obligations remain in force."

No extrinsic evidence was offered at the pretrial hearing on these issues, the two contracts being submitted to the court for its interpretation as a matter of law. The court's pretrial determination amounted to a holding that the contracts were not ambiguous or uncertain, and that their interpretation was a matter of law. ■■■ Whether a contract is ambiguous or uncertain is a question of law, and if it is held not to be ambiguous or uncertain the interpretation of the contract becomes a question of law. This is elementary. (See discussion and collection of cases, 12 Cal.Jur.2d p. 324, § 119.)

■■■ So far as the first contract is concerned, the court determined that it created a partnership between the contracting parties. Certainly the agreement is not ambiguous or

uncertain on this point. The terms of the agreement demonstrate without ambiguity that this is what the parties intended. The provisions for sharing profits, and giving each party an equal voice on all major policy matters can have no other meaning.

The case of *Constans* v. *Ross*, 106 Cal.App.2d 381 [235 P.2d 113], is directly in point, and very similar as to its facts to the instant one. There, two realtors and a contractor entered into a contract whereby the realtors were to secure suitable building locations and the contractor was to erect residences thereon. The realtors were to make arrangements for financing, and provide the plans and specifications. A formula for the division of profits was set forth in the agreement. Materialmen sued both the realtors and the contractor, and secured a judgment against them. This was affirmed. ■ The court held that under the terms of the agreement the realtors were partners of the contractor, and, as such, liable for the debts contracted by the partnership, and stated (p. 386) : "The question of the existence of a partnership depends primarily upon the intention of the parties ascertained from the terms of the agreement and from the surrounding circumstances. [Citations.] ■ Ordinarily the existence of a partnership is evidenced by the right of the respective parties to participate in the profits and losses and in the management of the business. [Citations.] ■ In ascertaining the intention of the parties, where they have entered into a written agreement, such intention should be determined chiefly from the terms of the writing. [Citation.] ■ While the question of whether a partnership exists is to be determined from the nature of the relation agreed upon rather than the name which the parties have given to it, some weight must be given to the language of the parties themselves. [Citations.] ■ It is the intention as evidenced by the terms of the agreement, and not the subjective or undisclosed intention of the parties, that controls."

The court then referred to the pertinent provisions of the contract, and summarized the evidence as to the conduct of the parties in carrying out its terms, and then pointed out that the apportionment of duties between the partners was not indicative of a nonpartnership intent and that the fact profits and losses were not equally shared did not compel a conclusion that no partnership existed, and then concluded (p. 389) : "Considering the terms of the agreement here involved and the conduct and activities of the parties thereto in carrying

on the business, the conclusion is impelled that a partnership existed. The agreement discloses an association for the purpose of carrying on a business and dividing the profits. And the agreement for division of profits implies an agreement also to bear the losses.''

▮ Appellants correctly point out that in the Constans case the contract was not interpreted solely from its terms but oral evidence of the surrounding circumstances were presented to and considered by the trial court, and then urge that in the instant case ''our complaint is that no evidence was permitted to be offered.'' (App. Rep. Br. p. 8.)

The record does not show that appellants, either at the pretrial hearing or at the main trial made any offer of any such evidence. But at the oral argument, and in a brief filed after oral argument, appellants, while conceding that no such offer at any time was made, argue that at the pretrial hearing the court ruled without such evidence that the contract created a partnership, that this was in effect a summary judgment on the issues decided, and made the offer of any such evidence at the trial futile.

These arguments are fallacious. The contending parties, prior to the main trial, submitted two issues to the court. These issues were presented by simply submitting the documents involved. If appellants desired to submit any extrinsic evidence that was the time to have done so. This they did not do. This so-called pretrial hearing was nothing more than the submission, by agreement, to the trial court of certain issues to be separately decided. Assuming that appellants have extrinsic evidence relevant to the issue, and the nature of such evidence has not been divulged, the time to have offered it was when the issue of interpretation was before the court.

In the second place, the minute order made after the pretrial hearing was only interlocutory and was not a final order. If at the time of the main trial appellants desired to offer extrinsic evidence on the issue, they could have asked the judge to change his ruling that such question was one of law, and could and should have made an offer to produce such evidence. This, appellants did not do. It is too late to object now.

A third reason why no error could possibly have occurred in reference to this matter, is that the trial court properly held that the first contract, without ambiguity and as a matter of law, created a partnership. Extrinsic evidence was not admissible, therefore, to interpret it. The terms of the contract in this respect are clear and unequivocal.

Appellants place some reliance on the provision that neither contracting party was to be liable for the debt, default, undertaking, contract or tort of the other. Whatever effect such provision may have had as between the partners themselves, it can have no effect on the partners' liability to third persons. As stated in *San Joaquin L. & P. Corp.* v. *Costaloupes,* 96 Cal.App. 322, 334 [274 P. 84] : "The courts will not countenance contrivances for giving persons the whole of the advantage of a partnership, without subjecting them to the liabilities, and an agreement which attempts to carry out a joint venture for the mutual profit of the adventurers and evade their responsibility for losses may be enforced and construed as creating a partnership."

The next argument of appellants is that all of respondent's assignors extended credit exclusively to the contractors, Gaither and Boe, at a time when they did not know of Gran-Wood's relationship to the transaction, and therefore even if Gaither and Boe, as partners, were agents of Gran-Wood, the agents alone are liable. An attempt is made to bring this case within the rule of *Rigney* v. *De La Salle Institute,* 10 Cal.App.2d 492 [52 P.2d 579]. There the plaintiffs, as here, were materialmen and subcontractors who had furnished the contractor with labor and material used in the construction of certain buildings for the defendant. The appellate court reversed a judgment for the plaintiffs, pointing out that the evidence demonstrated that the plaintiffs had extended the credits solely and exclusively to the contractor, who was defendant's agent. After completion of the building the plaintiffs executed and delivered final lien waivers to the contractor, thus accepting his exclusive credit for the payment of the debts, and releasing the property from all liability. The court quite properly held that under such a state of facts it would be improper to hold the owner personally responsible, stating (p. 499) : "The authorities amply bear out the conclusion that where exclusive credit is extended to the agent, regardless of any agreement by the parties, the rule of liability of an undisclosed principal is inapplicable, and the parties stand in the same relation as if the principal had at all times been disclosed. [Citations.]" (See also *Hayward's* v. *Nelson,* 143 Cal.App.2d 807 [299 P.2d 1013].)

The rule of these cases is not here applicable for the simple reason that there is no showing in the record to show that respondent's assignors extended the credits exclusively to Gaither & Boe. If appellants desired to raise that defense

to escape the normal rules of agency, they should have produced, or offered to produce, evidence on the issue. This they did not do.

Certainly, in the absence of any such evidence, the mere fact that respondent's assignors did not know of the Gran-Wood, Gaither and Boe, contract when they furnished labor and materials does not preclude them from now holding the partners of Gran-Wood. If this were the law then all the rules relating to the liability of an undisclosed principal would be meaningless. ▆▆▆ As this court stated in *Luce* v. *Sutton*, 115 Cal.App.2d 428, 433 [252 P.2d 352] : " 'It is a settled rule of the law of agency that a principal is responsible to third persons for the ordinary contracts and obligations of his agent with third persons made in the course of the business of the agency and within the scope of the agents' powers as such, although made in the name of the agent and not purporting to be other than his own personal obligation or contract.' (*Geary St. Park & Ocean R. Co.* v. *Rolph*, 189 Cal. 59, 64 [207 P. 539].) ▆▆▆ 'A creditor may sue an undisclosed principal when found although he may not have known of the existence of such principal at the time the debt was incurred.' (*Hulsman* v. *Ireland*, 205 Cal. 345, 352 [270 P. 948].) ''

In *Wahyou* v. *Kiernan*, 145 Cal.App.2d 443, 445 [302 P.2d 638], the court announced the same elementary rule, and then stated : "Again, here . . . there was no intervening circumstance such as was present in *Rigney* v. *De La Salle Institute*, 10 Cal.App.2d 492 [52 P.2d 579], . . . which would warrant a conclusion by this court that credit had been extended exclusively to Hemley, and it is only by such a circumstance that the defendant can escape liability under the general rule previously set forth.''

▆▆▆ If this is the rule as to undisclosed principals, and it clearly is, it certainly applies to an undisclosed partner. If a case is necessary to support such an obvious rule it is to be found in *Schwaegler Co.* v. *Marchesotti*, 88 Cal.App.2d 738 [199 P.2d 331], where the court laid down the rule by quoting from *Bissell* v. *King*, 91 Cal.App. 420 [267 P. 356], as follows (p. 743) :

" '. . . Thus in cases of secret partnership and dormant partners, a creditor is entitled to recover from all the partners when discovered, though the debt was not originally charged to all [citation], and even though one partner holds himself out as the sole owner, the ostensible partner is the agent of the

dormant one, and the latter is bound by his representations.'

"And in section 500 of the text of Rowley on Partnership, last cited, it is said:

" ' . . . As a rule, he [the dormant or undisclosed partner] is liable to the firm creditors to the same extent as if he were known to the creditor at the time the credit was obtained, under the doctrine that an undisclosed principal is liable for the acts of his agent. . . . If the dormant partner be completely so, and not known as such to the firm creditor, he will be liable to the firm creditor for indebtedness incurred by the firm to the creditor during the dormant partner's connection with the firm, . . . . ' " (See generally *Lindner* v. *Friednash*, 160 Cal.App.2d 511 [325 P.2d 612].)

Thus, the trial court was correct in concluding that the contract created a partnership between Gran-Wood and Gaither and Boe, and in holding that this rendered appellants liable for the goods and services furnished to Gaither and Boe and used in the construction of the partnership buildings. We do not find it necessary to determine whether the trial court was correct in simply concluding that a partnership existed, and in not making a finding to that effect, because this court, if such finding were necessary, could and would make it under the power conferred by section 956a of the Code of Civil Procedure. If we were to exercise such power such finding would, for reasons already stated, be in precise accord with the conclusion of law of the trial court.

The second main attack of appellants is on the findings to the effect that the second agreement did not constitute a novation. Appellants urge that appellants' assignors, at best, had a doubtful right to enforce personal liability against Gran-Wood, and that the substitute agreement constituted a compromise of that right. They urge, therefore, that the second agreement was a novation under the rule announced in *Bennett* v. *Bennett*, 219 Cal. 153 [25 P.2d 426]. That case held that a compromise of a disputed and doubtful claim is enforceable as a novation. Appellants rely on language of Gardiner contained in one of the letters constituting the contract to the effect that "We now understand that we have a definite deal as between ourselves, and that it is only contingent upon obtaining that approval from Hunter," which was admittedly later obtained, and claim such language demonstrates that the second agreement replaced the first.

In the instant case, the second agreement was not performed.

Had it been, it would have constituted an accord and satisfaction, and respondent could claim no rights under the first contract. In such event it would have become a substitute for that contract. Appellants would have us believe that the respondent's assignors intended to give up all existing rights against Gran-Wood in return for the mere promise of Gran-Wood to perform the second contract. The right against Gran-Wood being asserted by respondent's assignors was not a highly doubtful right, as appellants assert, but was a clear and obvious right. The mere fact that appellants refused to recognize it did not make it a doubtful right. To contend that respondent's assignors intended to surrender, completely, that right in return for the mere promise of Gran-Wood to perform the second agreement is contrary to ordinary business practice.

Interestingly enough, such contention is also contrary to the position taken by appellants in their answer to the complaint in which they denied that the second agreement "was or is a substituted agreement or a compromise agreement," alleging that there was no previous agreement at all for which the second could be a substitute or compromise.

Under the law the second agreement was clearly an executory accord and not a novation. A novation is defined in section 1530 of the Civil Code as the "substitution of a new obligation for an existing one." Section 1531 provides how it is made. It requires that the substitution be with the intent to extinguish the old obligation. An accord, on the other hand, is "an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." (Civ. Code, § 1521.) The next sections provide that an accord does not extinguish the obligation until it is executed. Acceptance of such performance by the creditor is the satisfaction of the accord.

Under these sections, which codify general law on the subject, a novation extinguishes one obligation by accepting for it another, that is, the creditor agrees to accept the second promise for his existing claim. But this is not true of an accord. Here it is not the new promise that is accepted in lieu of the existing claim, but the performance of that new promise. In 1 California Jurisprudence 2d, page 276, section 34, the applicable principles supported by many authorities are stated as follows:

"Acceptance by the creditor of the consideration of an accord extinguishes the obligation, and constitutes the satis-

faction. However, the obligation is not extinguished until the accord is fully executed, even though the parties to the accord are bound to execute it. In other words, an accord may be binding on the parties, but it does not discharge the obligation it is made to satisfy until it is executed. . . . .

"It is an elementary principle that an accord without satisfaction is not a bar, nor does it constitute a defense. In other words, if a second contract is but an accord, then the original obligation remains in force until the new one is performed." (See also discussion and cases cited 1 Am.Jur., p. 216, § 3.)

 In the instant case there is no evidence that respondent, on behalf of his clients, agreed to accept Gran-Wood's promise to complete three of the five structures as satisfaction of the pre-existing debts. Certainly, the presumption is against any such conclusion. The most reasonable and sensible interpretation of the correspondence is that the creditors were willing to accept performance of the agreement to finish three of the five houses in satisfaction of their existing claims, but extinguishment of those claims was conditional upon performance of the second promise. The correspondence in question between Gardiner and Selinger was a practical attempt at a practical solution by which creditors would get back some or all of their money, and Gran-Wood would be relieved of personal liability by salvaging the three buildings, which Gran-Wood obviously thought could be profitably done. But Gran-Wood found it to be unprofitable, and did not perform. Obviously, the whole agreement was prospective. What respondent's assignors wanted was performance of the second agreement. This they did not get. Thus, the original obligation was not extinguished and may be enforced. (See *United States Gypsum Co.* v. *Snyder-Ashe Co.,* 139 Cal.App. 731 [34 P.2d 767].)

 It is next urged that because respondent and his assignors were not parties to the contract between Gran-Wood and Gaither and Boe they cannot secure a construction of that contract in a declaratory relief action, because not persons "interested" in such contract. The point is without merit. The respondent's assignors were creditors of Gaither and Boe, and also creditors of Gran-Wood, if the contract between these two created a partnership. Certainly respondent's assignors had an interest, an important interest, in having it declared that the contract in question created a partnership. It seems clear that a person who has rights flowing from a contract has an "interest" in that contract, and should, in the

discretion of the trial court,* be able to maintain an action to secure a declaration of the character and extent of those rights when an actual controversy exists. (*Wollenberg* v. *Tonningsen*, 8 Cal.App.2d 722 [48 P.2d 738].)

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

---

*The entertainment of an action for declaratory relief is within the discretionary power of the trial court. Its decision will not be disturbed unless a clear abuse of discretion is shown. (§ 1061, Code Civ. Proc; *Schessler* v. *Keck*, 125 Cal.App.2d 827 [271 P.2d 588]; *Wieber* v. *Worton*, 105 Cal.App.2d 626 [234 P.2d 114]; *California Physicians' Service* v. *Garrison*, 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306].)