**SHASTA LIVESTOCK AUCTION YARD, INC., a corporation, Plaintiff,**

v.

**BILL EVANS CATTLE MANAGEMENT CORPORATION, a/k/a Evans Cattle Company, Defendant.**

**Civ. No. 1–72–60.**

United States District Court, D. Idaho.

March 6, 1974.

Rudolph D. Barchas, Rayborn, Rayborn & Barchas, Twin Falls, Idaho, for plaintiff.

Robert J. Koontz and Larry D. Ripley, Elam, Burke, Jeppesen, Evans & Boyd, Boise, Idaho, for defendant.

J. BLAINE ANDERSON, District Judge.

This matter came on for trial before the Court on January 14, 1974. Both parties now having filed their posttrial briefs, the Court feels it proper to set forth the facts in some detail and the legal reasoning behind its decision as this case presents difficult questions of law and ones which are of first impression in Idaho.

The plaintiff, Shasta Livestock Auction Yard, Inc., a California corporation (hereinafter called Shasta) brought this action against Bill Evans Cattle Management Corporation a/k/a Evans Cattle Company, an Arizona corporation (hereinafter called Evans) to recover the purchase price of 100 head of cattle which Shasta sold to Robert Benefiel, who Shasta contends was acting as agent for Evans, his undisclosed principal at the time of the sale. Jurisdiction is based upon diversity of citizenship and the requisite jurisdictional amount. 28 U.S.C.A. § 1332(a).

On March 3, 1972, Shasta put through its auction yard at Cottonwood, California, 380 head of steer calves which it had purchased on its own account. All of the steer calves were sold through the auction except 113 head, as Shasta had withdrawn that lot because it did not feel the highest bid offered was a good price. Shortly after the close of the sale, Ellington Peek, the manager of Shasta, approached one Roy Sharp, a local order-buyer of cattle, and inquired whether he could use them or if, in the alternative, he knew of someone who wanted them. Sharp indicated that he could not use the cattle, but stated he would try to find a buyer. Thereafter Sharp contacted a local cattle company which was not interested in the cattle but which indicated that Robert Benefiel, an Idaho cattle buyer, may be interested. That evening Sharp telephoned Benefiel in Idaho, asking if he was interested in the 113 head. Benefiel stated he would know the following day if he could use them.

The following evening, March 4th, Sharp again telephoned Benefiel to inquire about the cattle. Benefiel stated that he would buy the cattle if he could get 100 of the lightest head offered. Sharp then telephoned Peek and stated that he had found a buyer upon the condition that 13 head be separated from the lot. Peek accepted the condition. Sharp again telephoned Benefiel confirming the sale and Benefiel stated he would contact a local trucking company in California to let them know where the cattle should go. That evening Shasta prepared an invoice showing that the cattle were being purchased on account with Benefiel.

On March 6th Sharp sent a bill for the cattle to Benefiel in the amount of

$22,317.41 plus Sharp's commission of $.25 per hundred weight on the cattle, stating that the payment for the cattle should be sent to Shasta and the commission check to him. Also on that day the cattle were shipped to Burley, Idaho, and placed in a feed lot, part of which was being used by Evans. It is not disputed that the sale of the cattle to Benefiel was on credit, that being the custom of the cattle buying industry, and that at the time of the sale Shasta was relying solely on the credit of Benefiel for payment.

Evans is a cattle management corporation. Its business is buying cattle for individual investors, managing and feeding the cattle for a fixed fee, and then selling them at a profit for their investors. Evans buys cattle throughout the United States and, at the particular time of this sale, was buying cattle to place in the feed lot in Burley, Idaho. Benefiel, during the first quarter of 1972 and for a lengthy period prior to that, was an order-buyer of cattle registered as a dealer and a market agency under the Packers and Stockyards Act. During 1971 and the first quarter of 1972 he was acting entirely in his capacity as a market agency as he was buying and selling upon a commission basis. Evans commenced buying cattle from Benefiel in the Spring of 1971 and continued to do so up to the Spring of 1972. Their business relationship progressed to the point that during the three months prior to the time that this controversy arose, Evans was doing between 50 and 75% of its buying from Benefiel and Benefiel was doing between 60 and 75% of his business with Evans. They conversed by telephone almost daily.

As it relates to the events surrounding this particular transaction, their business relationship seemed to be very close. During the latter part of February or early March, 1972, Evans desired to place a larger group of cattle in a feed lot in Idaho, to put the cattle on a growing ration for a period of time and then transfer the cattle to California for sale. Pursuant to that desire, Bill Evans, President of the defendant corporation, Bob Crowder, its Vice President, and Benefiel looked at various feed lots around the Burley, Idaho, area. Thereafter, they met with a part owner of the Shults and Allred Feed Lot in Burley, Robert Shults, and discussed placing cattle in that lot and the feeding arrangement for them. Shults testified at trial that during this meeting Evans stated that Benefiel would be buying cattle for him to place in this feed lot and would furnish the necessary brands of the individual investors. Evans' recollection of the conversation was that "We (meaning Evans Cattle Company) will be putting cattle in your feed yard." Soon after this meeting cattle began arriving at the Shults and Allred Feed Lot, including the 100 head purchased by Benefiel from Shasta. From the time the cattle arrived Evans began paying the feed bill on the cattle.

Mr. Benefiel's business practices during this period of time were less than ideal. He was, to the ignorance of all who did business with him or for whom he bought cattle, operating on what is commonly called a "float". As to Evans, the float operated by Benefiel first buying cattle on his own account and then selling the cattle to Evans at less than what he paid for them, plus his commission of $.25 per hundred weight. Benefiel would draft on his own account for the purchase price of the cattle. Then he would draft on Evans' bank account in Arizona payable to himself, deposit the draft on Evans' account in his own account and receive immediate credit. Thus, so long as he would receive immediate credit at his own bank for drafts drawn on those to whom he sold cattle, he would sell the cattle to them at a reduced price because the draft in payment for the cattle would take a few days to go through banking channels before it was presented at his own bank for payment. By this time he would have written other drafts on Evans' or someone else's account which would cover the prior draft sent as payment for the cattle. However, like all "floats", the

process is inevitably going to fail. There was simply more money going out of his account than was coming in.

In this instance Shasta received Benefiel's draft in the amount of $22,317.41 as payment for the cattle on or about March 12. The draft was, however, postdated to March 15. Already Benefiel had deposited in his account on March 9 a draft on Evans' account evidencing payment by Evans to Benefiel for the cattle. The amount of this draft was $18,852.75, representing a price of $36.50 per hundred weight for the cattle plus Benefiel's commission of $.25 per hundred weight. This draft was approved by Evans about March 12, after checking the cattle, it being the custom between the two to only approve payment on a sale by sale basis after checking the cattle. Thus, Evans had paid Benefiel for the cattle. But the Benefiel draft to Shasta happened to reach his account at an inappropriate time. The float had sunk.

Shasta argues rather convincingly the position that the legal effect of the relationship between Evans and Benefiel was that of undisclosed principal and agent. Evans counters with an affirmative defense alleging that Evans' payment to Benefiel for the cattle discharged its liability. Preliminary to the latter question is the consideration of which state's law should apply, as the transactions between Shasta, Benefiel and Evans took place in both California and Idaho. Further, Evans had alleged a counterclaim against Shasta for recovery of the defendant's redelivery bond premium, contending that the claim and delivery action which was instituted by Shasta at the outset of this controversy was wrongful.

The question of whether Benefiel was in legal effect an agent for Evans is a difficult one, but the facts found above lend themselves to that conclusion. However, this issue need not be resolved in the present case, and this Court makes no legal conclusions on the issue, for even assuming arguendo the existence of an agency relationship between Evans and Benefiel, the payment by Evans to Benefiel discharged Evans from liability.

This Court, sitting in a diversity case, must apply the conflict of law rules of the forum state; in this instance Idaho. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). But before a conflict of law rule may be applied, the question under consideration must be properly classified as a question of contract or agency.

The question under consideration is the effect of the undisclosed principal settling his account with the agent. This is an agency question. The Court is not interpreting a contract or a parole agreement between the agent and the undisclosed principal. Neither is the Court determining the rights and duties of undisclosed principal and agent toward each other, as plaintiff argues. The Court, however, is interpreting a rule of the law of agency which determines the rights and liabilities between the undisclosed principal and a third party creditor. Therefore, the conflict of law rules for questions of agency should be applied.

Idaho has not, at least so far as our research indicates, adopted conflict of law rules which should be applied to questions of agency. Therefore, the Court must determine what choice of law rules the Idaho Court would apply if it were presented with the question.

Idaho adopted the Restatement (Second) of Conflict of Laws (1968) in Rungee v. Allied Van Lines, Inc., 92 Idaho 718, 449 P.2d 378 (1968). Although the Idaho Court in *Rungee* applied the conflict of law rules for contract questions, the following language leads the Court to believe that Idaho would apply the law of the state with the more significant relationship to any particular issue, whether it be agency or contract:

> "Therefore we view the question as one of deciding whose law, as to the particular issue involved, has the more

significant relationship to the transaction and the parties . . . `

"This choice-of-law process involves not the mechanical jurisdiction-selecting rules of the first restatement but rather a realistic inquiry into the relationship of various laws to the particular issue to be decided." Id. at 722, 723.

The Restatement (Second) of Conflict of Laws does not provide a specific choice of law rule that should be applied to the question of the effect of payment by the undisclosed principal to his agent. However, it does provide in § 292 as follows:

"(1) Whether a principal is bound by action taken on his behalf by an agent in dealing with a third person is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6."

As the comments to § 292 point out, the section is generally designed to aid in determining which law applies to questions of an agent's authority, and states that it applies to disclosed and undisclosed relationships "at the time of the agent's act." However, as § 292(1) and the *Rungee* case indicate, the applicable law as to the particular issue involved should be the law of the state with the most significant relationship to the parties and the transaction under the principles stated in Restatement (Second) of Conflict of Laws § 6 (1971). § 6 provides, in relevant part, as follows:

"the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of results, and

(g) ease in the determination and application of the law to be applied."

Thus, the question is which state's law with respect to the issue of the effect of payment by the undisclosed principal to his agent has the most significant relationship to the transaction and the parties under the above principles.

Shasta is a California corporation with its auction yard and principal place of business in California. Evans, at the time relevant here, was an Arizona corporation with its principal place of business in Arizona, but which conducted its business throughout the United States. Benefiel was an Idaho resident who bought and sold cattle throughout the Western United States. The contract for the sale of the 100 head of cattle was entered into in California between Benefiel and Shasta. The cattle were transported to Idaho. The relationship between Evans and Benefiel was centered in Idaho and payment by Evans to Benefiel was in Idaho by draft on Evans' Arizona account, payment of the draft being authorized by Evans after presentment at Evans' bank. California law on the effect of payment by an undisclosed principal to his agent is found in West's Ann.Civ.Code § 2335 and the cases dealing with that statute. § 2335 provides:

"*When Exclusive Credit is Given to Agent.* If exclusive credit is given to an agent by the person dealing with him, his principal is exonerated by payment or other satisfaction, made by him to his agent in good faith, before receiving notice of the creditor's election to hold him responsible."

Idaho has no law on the subject. However, the Restatement (Second) of Agency § 208 (1971) expresses what is considered the more modern view:

"*Settlement with Agent by Principal.* An undisclosed principal is not discharged from liability to the other

party to a transaction conducted by an agent by payment to, or settlement of accounts with, the agent, unless he does so in reasonable reliance upon conduct of the other party which is not induced by the agent's misrepresentations and which indicates that the agent has settled the account."

Applying the principles of the Restatement (Second) of Conflict of Laws § 6, the Court finds that California has the most significant relationship to the parties and the transaction in regard to the issue of the effect of an undisclosed principal settling his account with the agent. The first factor, the needs of the interstate and international system, seems largely irrelevant when a court attempts to apply the law of the state with the most significant relationship. Regardless of which state's law is applied, the needs of the interstate system will be promoted because that state will be the most interested and have the most significant relationship to the parties' transaction.

As to the second factor, relevant policies of the forum, Idaho has expressed no policy, legislative or judicial. Even assuming that Idaho had spoken on the subject, it would not appear to be an interested jurisdiction, even though the payment to the agent was in Idaho. The policy behind a rule on the effect of payment by an undisclosed principal to his agent is either to protect the third party creditor or to protect the principal when the third party creditor has relied solely on the agent for payment. In this case there is neither an Idaho creditor nor an Idaho principal.

The third factor, the policies and interests of other interested states, points to the application of California law. Shasta, the third party creditor, is a California corporation. The contract between Benefiel and Shasta was entered into in California. California's policy is to not protect third party creditors who have extended exclusive credit to an agent when the principal has in good

faith settled with that agent. Their policy is to protect the principal in such a situation. Granted that Evans is not a California principal, but, assuming agency Evans has subjected itself to California law by authorizing Benefiel to buy cattle in California, as well as other states.

The fourth factor, protection of justified expectation of the parties, likewise, points to application of California law. Shasta would expect California law to apply on the legal effect of the contract with Benefiel. As to the basic policies underlying the particular field of law, the various jurisdictions seem to apply both the California and the Restatement (Second) view on the issue (See 71 A. L.R.2d 911, 917), the California view appearing to hold a slight majority. Application of the law of the state with the most significant relationship likewise will lead to uniformity of results. The law of the most interested state will always be applied to the determination of the outcome of the controversy.

Finally, though application of a more mechanical choice of law rule may be easier, application of the law of the state with the most significant relationship best promotes the other principles expressed above. Thus, California is the most interested state and has the most significant relationship to the transaction and the parties under the above principles, the transaction under consideration being the payment by Evans to Benefiel.

The California decisions interpreting West's Ann.Civ.Code § 2335 have dwelled upon the words "exclusive credit". In Rigney v. DeLaSalle Institute, 52 P.2d 579 (D.C. of App., Cal.1936), various plaintiff materialmen and subcontractors brought suit against the undisclosed principal of the prime contractor for the balance due on labor and materials furnished. The agent was personally known by the plaintiffs and they had known and dealt with him as an independent contractor on other jobs.

However, they did not know he had entered into an agency agreement with the owner of the land for this particular job. The plaintiffs were to be paid for their labor and materials as the work progressed. However, as each progress payment came due, the agent contractor had each plaintiff sign a lien waiver which he then presented to the defendant's representative in order to get payment, which he, in turn, gave the plaintiffs. At the end of the job the agent executed final lien waivers which plaintiffs signed. The agent then secured payment, but did not pay the plaintiffs.

The court in *Rigney* stated the general rule that a third party may recover from an undisclosed principal upon discovery of his existence but that one of the tests of the undisclosed principal's liability is whether exclusive credit had been extended to the agent. All of the plaintiffs testified that exclusive credit had been given to the agent. As further evidence of exclusive credit, each of the plaintiffs had signed the lien waivers. The court therefore held the undisclosed principal absolved from any liability.

In this matter Ellington Peek testified on cross-examination that he did not know Benefiel personally, but knew he was buying a lot of cattle in the area, although this was the only purchase from Shasta by Benefiel. Peek further testified that at the time of the sale he relied on Benefiel for payment. Coupling these statements with the fact that Shasta sought out Benefiel to purchase the cattle, did not know of, or rely upon, any agency relationship, assuming its existence, between Evans and Benefiel, did not know to whom the cattle would be sold eventually, if at all, *and allowed the cattle to leave their auction yard without a draft payable to them, thus enabling Benefiel to secure payment from Evans,* leads the Court to the conclusion that Shasta did extend exclusive credit to Benefiel. *Shasta, by its own actions, put Benefiel in a position where he could demand payment from Evans before paying Shasta.* At the time that Evans authorized Benefiel's draft for the cattle, Evans could rightfully assume that Benefiel had paid for the cattle. Evans knew nothing of the breakdown in the transaction between Shasta and Benefiel. The Court believes that this constitutes the type of intervening circumstances which justify invoking § 2335 under the *Rigney* case. See Standard Oil Company of California v. Doneux, 192 Cal.App.2d 608, 13 Cal. Rptr. 749 (1961) and Wahyou v. Kiernan, 302 P.2d 638 (D.C. of App., Cal. 1956).

§ 2335 further requires that before the principal is discharged, payment to the agent must be made in good faith before the principal learns of the creditor's election to look to the principal for payment. As discussed infra, Evans made payment before Shasta knew of Evans' existence, long before Shasta attempted to pursue Evans for payment, and before Evans knew of the breakdown between Shasta and Benefiel. However, this also raises the question of the admissibility of plaintiff's Exhibit 4 which was admitted subject to a motion to strike on relevancy grounds.

Exhibit 4 is a certified copy of the weekly Livestock Market Reports for Northern California. Its purpose at the time of admission was to show that the price paid by Shasta for the cattle was a fair price and that they in turn were sold to Benefiel at a fair price. There was testimony that the market price for cattle of the same type and quality as the particular 100 head involved in this dispute should not differ to any great extent among the Western States. The exhibit therefore is relevant to the issue of whether the payment by Evans to Benefiel for the cattle was made in good faith. It was properly admitted.

There are, to the Court's knowledge, no decisions defining good faith in the context of § 2335. However, California, like all other states, defines good faith in commercial transactions as hon-

esty in fact in the transaction and observance of reasonable commercial standards. West's Ann.Calif.Comm.Code §§ 1201, 2103. Plaintiff argues that Evans' payment to Benefiel could not have been in good faith. The Court believes otherwise.

There is no question that Evans paid less than the fair market price for the cattle. However, this is in no way conclusive on the issue of good faith.

■ There is no evidence in this case that Evans knew or even suspected that Benefiel was selling cattle to Evans for less than his cost of obtaining them. In fact, Benefiel's affidavit expressly states that neither Evans nor anyone else knew of the activity. The usual practice between the two was that Benefiel kept Evans advised of the market price of cattle and Evans would request that Benefiel buy so many head of cattle or Benefiel would state that he had so many cattle and Evans would ask the price and then agree to buy or not buy. Evans relied on Benefiel for accuracy of the market price and, due to the lengthy and, up to March of 1972, satisfactory business relationship with Benefiel, Evans had a right to rely on Benefiel's statement of market price and charges as reflecting what he had paid for the cattle. There is no evidence, other than sheer speculation, that Evans' payment to Benefiel was not made in good faith.

■ Even if this Court's analysis and choice of California law is in error, the result would be the same. It is this Court's opinion that the equities under this precise factual situation would dictate application of the rule adopted herein and that the Idaho Supreme Court would so rule if presented with the issue. Indeed, the facts here may well justify application of the Restatement (Second) of Agency rule, Sec. 208, supra. Shasta looked exclusively to Benefiel as principal. Shasta extended credit and delivered possession of the cattle to Benefiel, putting him in a position to mislead others. Evans did not, of course, do anything to mislead Shasta. As found herein, Evans acted honestly and in good faith in making payment to Benefiel. There is no evidence of any prior conduct of Benefiel that would put Evans on notice that Benefiel was not paying his accounts for cattle purchased by him, whether for himself, Evans or others. To hold otherwise on these facts would create an undue hardship on Evans and creates a wholly fortuitous and unexpected windfall for Shasta. 2 Williston on Contracts, (3rd Ed.) Sec. 292, p. 369.

Lastly, defendant's counterclaim for $893.00, the amount of its redelivery bond premium, is based on the contention that plaintiff's claim and delivery action under Idaho Code § 8–301 et seq., instituted in state court and removed to this court, was wrongful. Plaintiff's action for claim and delivery was instituted on April 12, 1972, in state court. Robert Benefiel filed his petition in bankruptcy on March 31, 1972.

■ Plaintiff's action for claim and delivery comprised Counts II and III of the amended complaint wherein plaintiff sought to recover possession of the 100 head of cattle under theories of an alleged fraudulent transfer by Benefiel and the imposition of a legal or equitable lien on the cattle. This Court in its Memorandum Decision of September 18, 1972, struck those counts from plaintiff's complaint, ruling that any interest which plaintiff may have had in the cattle under either theory passed to the trustee in bankruptcy under 11 U.S.C. § 110 *on the date of bankruptcy*. That being the case, plaintiff should have known that it would not have a *right* to claim possession of the cattle on April 12, 1972, almost two weeks after the date of Benefiel's bankruptcy. Plaintiff argues that because the bankruptcy trustee did not assert his claim to the cattle until April 14, 1972, the claim and delivery action was not wrongful as a matter of law when instituted. This argument is without merit. The right of the plaintiff to claim possession of the

cattle from Evans would have passed to the trustee on the date of bankruptcy, not the date when the trustee instituted his claim in court. Whether the claim to possession which passed to the trustee is in fact meritorious is a matter for another lawsuit, which the Court, of course, does not in any manner decide here. It is the *right* to claim possession which passed to the trustee on the date of bankruptcy. Since plaintiff had no right to claim possession, the action for claim and delivery was wrongful as a matter of law within the holding of National Motor Service Co. v. Walters, 85 Idaho 349, 379 P.2d 643 (1963). Under *Walters* the expense of a redelivery bond is a recoverable cost by a party who has been wrongfully dispossessed of property. The defendant is therefore entitled to recover $893.00 for the redelivery bond premium.

It is therefore ordered that defendant's Motion to Dismiss under F.R.Civ. P. 41(b) made at the conclusion of the trial be, and the same hereby is, granted and the plaintiff's Complaint dismissed, and

It is further ordered that defendant is entitled to, and shall recover from plaintiff, the sum of $893.00 on its counterclaim, its costs of court, and

It is further ordered that defendant's Motion to Compel an Election which the Court took under advisement, be, and the same hereby is, denied on the grounds and for the reason that the same is moot.

In view of the rather full development of the facts and the law, this Memorandum and Order shall constitute the Findings of Fact and Conclusions of Law in this case. Rule 52(a) Federal Rules of Civil Procedure. Elam v. United States, (CA 6th 1958), 250 F.2d 582, cert. den., 358 U.S. 848, 79 S.Ct. 73, 3 L.Ed.2d 81. Counsel for defendant shall forthwith prepare and submit a proposed Judgment carrying this decision into effect.